# SHERYL BROADNAX ET AL. *v.* CITY OF NEW HAVEN ET AL.
## (SC 16786)

Borden, Katz, Palmer, Vertefcuille and Zarella, Js.

Argued February 18—officially released July 13, 2004

*Martin S. Echter*, deputy corporation counsel, for the appellants-appellees (defendants).

*W. Martyn Philpot, Jr.*, for the appellees-appellants (plaintiffs).

*Patricia A. Cofrancesco*, for the appellee (intervening defendant).

*Opinion*

BORDEN, J. The defendants appeal and the plaintiffs cross appeal from the judgment of the trial court.[1] The plaintiffs, Sheryl Broadnax, Ronald Benson, John R. Brantley, Danny Dolphin, Clifton Pettaway and Christopher Texeira brought this action against the defendants, the city of New Haven (city), the city's department of fire services (fire department), the city's board of fire commissioners, and the city's civil service commission, seeking various relief as a result of the defendants' use of "underfilling"[2] as a means of funding promotions

---

[1] The defendants appealed and the plaintiffs cross appealed from the judgment of the trial court to the Appellate Court. We transferred the appeal and cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

[2] Underfilling, as the term is used in the present case, occurs when the fire department promotes an individual to a particular position, and the city's budget has not allocated funds to pay the salary of that position, whereby funds for a vacant higher ranking position are used to pay for the newly appointed lower ranking position. For example, if ten individuals are promoted to lieutenant, and only five vacancies exist in the budget for the position of lieutenant, but several vacancies exist in a higher ranking position, such as captain or battalion chief, the first five newly appointed lieutenants are promoted and paid with budgeted lieutenant funds, but the next five newly appointed *underfilled* lieutenants are paid with funds reserved for the vacant captain or battalion chief positions. Thus, when an individual

within the fire department. The plaintiffs alleged that underfilling is a discriminatory practice that violates: (1) the city's civil service rules and regulations; (2) the city's affirmative action plan; (3) the city's charter; (4) their federal constitutional rights via 42 U.S.C. §§ 1981[3] and 1983;[4] and (5) article first, §§ 1[5] and 10,[6] of the constitution of Connecticut. The plaintiffs sought, among other things: (1) an order enjoining the defendants from engaging in the practice of underfilling; (2) an order voiding all promotions made through the use of underfilling; (3) punitive damages; (4) compensatory damages; and (5) attorney's fees. Thereafter, New Haven Firefighters Local 825 intervened in the action as a defendant.

---

employed at a lower ranking position is paid from funds reserved for a higher ranking position, that individual is considered to have been underfilled.

[3] Section 1981 of title 42 of the United States Code provides in relevant part: "(a) . . . All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. . . .

"(c) . . . The rights protected by this section are protected against impairment by nongovernmental discrimination impairment under color of State law."

[4] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[5] Article first, § 1, of the constitution of Connecticut provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[6] Article first, § 10, of the constitution of Connecticut provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

Upon the defendants' motion, the trial court, *Devlin*, *J.*, struck the plaintiffs' claims alleging violations of their federal and state constitutional rights. Thereafter, the trial court, *Munro*, *J.*, permanently enjoined the defendants from engaging in the practice of underfilling, and appointed a special master to oversee promotions within the fire department. After the defendants appealed and the plaintiffs cross appealed to this court, and following the plaintiffs' motion for contempt, the trial court, *Munro*, *J.*, expanded the duties of the special master to oversee the hiring of new hires within the fire department. The defendants amended their appeal to challenge this subsequent ruling as well.

On their appeal to this court, the defendants claim, among other things, that: (1) the plaintiffs lack standing to challenge the defendants' use of underfilling; (2) the trial court improperly concluded that underfilling violates the city's charter, municipal ordinances and the civil service rules and regulations; (3) the trial court abused its discretion when it appointed a special master to oversee promotions within the fire department; and (4) the trial court improperly expanded the duties of the special master to oversee the hiring of entry-level trainees. We conclude that: (1) four of the six plaintiffs lack standing to challenge the defendants' use of underfilling in the present case; (2) the trial court properly concluded that underfilling is not permissible in the present case; (3) the trial court did not abuse its discretion by appointing a special master to oversee promotions within the fire department; and (4) the trial court improperly expanded the duties of the special master because all of the plaintiffs lacked standing to challenge the hiring of entry-level trainees.

On their cross appeal, the plaintiffs claim that the trial court improperly: (1) granted the defendants' motion to strike their claims alleging violations of their federal and state constitutional rights; (2) failed to void retroac-

tively all promotions made through the process of underfilling; and (3) failed to award attorney's fees to the plaintiffs. With regard to the plaintiffs' first claim, we conclude that the trial court improperly struck the plaintiffs' claim alleging a violation of their federal equal protection rights. We also conclude, however, that we have no basis on which to disturb the trial court's ruling striking the remainder of the plaintiffs' claims alleging violations of their federal and state constitutional rights. Finally, we reject the plaintiffs' claims regarding the trial court's failure to void promotions made through underfilling and its failure to award attorney's fees.

The following facts and procedural history, however convoluted, are relevant to our resolution of this appeal and cross appeal. The plaintiffs are all African-American firefighters. The city and its fire department have been involved in litigation dating back to 1975, when the United States District Court for the District of Connecticut, *Zampano, J.*, ordered the fire department to increase its hiring of minority firefighters on a prescribed timeline with a targeted hiring goal. Thereafter, in 1989, the New Haven Firebird Society (Firebird Society), an organization of minority firefighters, brought an action challenging a practice in the fire department known as "stockpiling." See *New Haven Firebird Society* v. *Board of Fire Commissioners*, 32 Conn. App. 585, 587–88, 630 A.2d 131, cert. denied, 228 Conn. 902, 634 A.2d 295 (1993). Stockpiling is a practice in which individuals are promoted to positions that are not yet vacant, just prior to the expiration of a civil service promotion eligibility list. Id., 588. Persons promoted through stockpiling, however, would not receive the pay, or perform the duties, of the newly acquired position until a vacancy eventually occurred. Id. Stockpiling was held to violate the city's charter and civil service rules and regulations because the practice resulted in some promotions actually taking effect after the appli-

cable civil service eligibility list had expired. Id., 592–93. As a result of the litigation by the Firebird Society, the practice of stockpiling was abandoned prospectively, and promotions that had taken effect after the expiration of the eligibility list were judicially invalidated retroactively. Id., 589. This reshuffling of positions, as well as the retirement of other higher ranking firefighters, caused several vacancies in the fire department's command structure, particularly among the ranks of lieutenant and captain. Further, in the years following the trial court's decision in the action brought by the Firebird Society, the fire department ceased to administer civil service examinations, which prevented it from filling those vacancies through promotions.

Promotions within the fire department are governed by the city's civil service rules and regulations, which require individuals to pass an examination before becoming eligible to be promoted to a particular position.[7] After the examination results are calculated, the names of passing candidates,[8] along with their corresponding examination scores, are placed on an eligibility list. Names on the list are arranged in "rank order," meaning that the individual with the highest examination score is listed first, followed by names arranged in descending examination score order.

When a vacancy opens for a particular position, individuals are promoted from the eligibility list in rank order, on the basis of their examination score.[9] For

---

[7] Only individuals who have had at least one year of service at a particular rank are eligible to sit for a promotional examination for the next higher rank. For instance, only lieutenants with at least one year of experience at that rank may sit for a captains examination; only captains with at least one year of experience at that rank may sit for a battalion chiefs examination.

[8] Examination grades are based on a scale of 100 points. Candidates must receive a score of at least 70 percent in order to pass an examination.

[9] Although the fire department has the authority to select among the top three individuals from the eligibility list, it has historically promoted in rank order; and in the event that the highest ranking candidates have the same examination score, the most senior of the tied candidates is promoted.

example, if two positions for the rank of lieutenant are vacant, the two individuals who scored the highest on the most recent lieutenants examination, i.e., the two names atop the eligibility list, will be promoted to lieutenant. In this regard, promotions within the fire department are predictable; so long as there is a current eligibility list for a particular position, firefighters know who is next in line to be promoted.

Pursuant to the civil service rules and regulations, eligibility lists expire two years from the date on which they are certified, i.e., the date on which the examination results are officially released. Accordingly, if an eligibility list for a particular position has expired, and the fire department has yet to administer another examination for that position, then the fire department will be unable to promote to that position; until, of course, an examination is administered and a new eligibility list is certified.

In addition, promotions in the fire department are funded through the city's annual budget. The city's board of aldermen creates the budget, which when passed and signed by the city's mayor, has the force of a city ordinance. When the board of aldermen produces the budget, it does so on a line-by-line basis. Thus, when the budget was enacted for fiscal year 1996–1997, it did not authorize a "bottom line" for the fire department's funding; rather, the budget specified the number of firefighter personnel authorized to receive pay at each rank and the funds allotted for those positions.

As previously alluded to, while the fire department was awaiting the finality of the Firebird Society litigation, the fire department refrained from promoting individuals to certain positions, and failed to administer civil service examinations. As a result, the most recent eligibility lists for lieutenant and captain had expired in March, 1988, and December, 1989, respectively. Thus,

by the mid-1990s, although the fire department needed to promote firefighters to certain supervisory positions, such as lieutenant and captain, it could not do so until new promotional examinations were administered.

Martin J. O'Connor was the chief of the fire department from January, 1996, to January, 1998. In order to fill the fire department's need for additional lieutenants, captains and battalion chiefs, O'Connor requested that civil service examinations be administered for those positions. In September, 1995, a lieutenants examination was administered, and the eligibility list pertaining to that examination was certified in January, 1996, expiring in January, 1998. A captains examination, however, was not administered until April, 1998. Thus, in early 1996, even though the fire department needed to fill vacancies for the positions of lieutenant *and* captain, it could only promote individuals to lieutenant because a captains examination had not yet been administered.

According to O'Connor, the fire department's command structure was seriously lacking in supervisory positions. It was O'Connor's position that the fire department could not wait for the administration of additional civil service examinations; rather, O'Connor set out to fill vacant positions immediately.[10] Accordingly, between 1996 and 1997, the fire department promoted to lieutenant, in standard rank order, forty individuals who had passed the September, 1995 lieutenants examination. This brought the total number of lieutenants beyond that which the city budget allowed. In order to pay the excess lieutenants, the fire department used funds allocated for vacant captain and battalion chief positions. Thus, although the fire department

---

[10] The fire department had been utilizing an authorized procedure whereby firefighters were appointed to a higher rank, and received pay for that higher rank, for particular shifts on an as-needed basis. O'Connor maintained that using inexperienced firefighters as "acting" officers in this manner was inefficient and dangerous.

exceeded the appropriations in the budget allocated for lieutenants, the department was within the budget for the appropriations devoted to captains and battalion chiefs; and it was within its total budgeted salary expense. The practice of using funds allocated for a vacant higher rank to pay individuals employed at a lower rank is known as "underfilling."[11]

After serving the requisite time in grade; see footnote 7 of this opinion; the newly promoted lieutenants, including those promoted through underfilling, became eligible to sit for a captains examination, which was administered in April, 1998. Some of the underfilled lieutenants were subsequently promoted to captain on the basis of their success on the captains examination.

The plaintiffs brought this action challenging the defendants' use of underfilling. In a substitute complaint,[12] the plaintiffs alleged that underfilling has "effectively so diluted the pool of eligible candidates for promotional positions within the [fire department] that the plaintiffs' opportunity to be promoted have been unfairly and adversely affected . . . ." In this regard, the plaintiffs alleged that the defendants' use of underfilling has disproportionately favored Caucasian firefighters and "has had a detrimental and discriminatory effect upon the number of African-Americans hired and promoted within the [f]ire [d]epartment." In addition, the plaintiffs alleged that underfilling violates the

---

[11] Before engaging in the practice of underfilling, O'Connor sought approval from the board of fire commissioners, which has the ultimate authority in personnel decisions. After inquiring with the attorney for the city, the board approved the use of underfilling.

[12] The plaintiffs began this litigation by way of a verified complaint dated April 23, 1998. An amended complaint was filed dated June 23, 1999, a second amended complaint was filed dated July 8, 1999, and a third amended complaint was filed dated July 23, 1999. After the trial court, *B. Levin, J.*, granted the defendants' motion to strike with respect to a substantial portion of the third amended complaint, the plaintiffs filed this substitute complaint dated May 31, 2000.

city's civil service rules and regulations, the city's affirmative action plan, and the city's charter. The plaintiffs claimed, therefore, that: (1) they "have been denied due process and/or the equal protection of laws in direct violation of" 42 U.S.C. §§ 1981 and 1983; see footnotes 3 and 4 of this opinion for the text of those provisions; and (2) the defendants' actions "constitute clear violations of the plaintiffs' state constitutional rights found within the Connecticut [c]onstitution, including [a]rticle [f]irst, §§ 1 and 10." See footnotes 5 and 6 of this opinion for the text of those provisions. The plaintiffs sought, among other things: (1) an order enjoining the defendants from engaging in the practice of underfilling; (2) an order voiding all promotions made through the use of underfilling; (3) punitive damages; (4) compensatory damages; and (5) attorney's fees.

The defendants moved to strike the plaintiffs' complaint on various grounds. With regard to the plaintiffs' federal due process claims, the trial court, *Devlin, J.,* concluded that the plaintiffs do not have a constitutionally protected property interest in having an employment environment that is free from discrimination. The trial court next concluded that the plaintiffs had failed to state a cause of action that underfilling violates their federal equal protection rights because the plaintiffs had failed to allege that the defendants intentionally or purposefully discriminated against them. Finally, on the basis of its conclusions regarding the federal constitutional claims, the trial court rejected the plaintiffs' state constitutional claims because, according to the trial court, the rights guaranteed by article first, §§ 1 and 10, of the constitution of Connecticut are coextensive with the rights guaranteed by the due process and equal protection clauses of the federal constitution. Accordingly, the trial court granted the defendants' motion to strike the plaintiffs' complaint.[13]

---

[13] This complaint was set forth in two counts. The first count contained several allegations, and ultimately claimed that underfilling violates the

After the plaintiffs filed a notice of their intent to appeal with respect to their federal and state constitutional claims, the plaintiffs filed a second substitute complaint, which contained substantially the same factual allegations as the previous complaint, but did not contain the claims alleging due process and equal protection violations under both the federal and state constitutions. Moreover, in the second substitute complaint, the plaintiffs did not specifically seek damages or attorney's fees; rather, they sought only declaratory and injunctive relief. Specifically, the plaintiffs requested an order: (1) enjoining the defendants from administering additional promotional examinations; (2) forbidding the practice of underfilling in the fire department; and (3) voiding all promotions made through the use of underfilling. The defendants again moved to strike the plaintiffs' complaint on various grounds, but the trial court denied that motion.

A trial to the court, *Munro, J.*, ensued. The trial lasted eight days, with the court hearing the testimony of nineteen witnesses and admitting more than seventy documents into evidence. As a threshold matter, the trial court concluded that the plaintiffs had standing to challenge the defendants' use of underfilling, because they "have a specific interest in the outcome of this proceeding, since the utilization of underfilling in the department affects the applicant pool for all promotions." With regard to the plaintiffs' claim that underfilling violates the city's affirmative action plan, the trial court concluded that, because the plaintiffs did not file a

plaintiffs' federal constitutional rights. The second count incorporated the first count, and ultimately claimed that underfilling violates the plaintiffs' state constitutional rights. The trial court struck this complaint in its entirety, even though the court did not address the plaintiffs' claims, contained in the first count, that underfilling violates the city's charter, affirmative action plan, and civil service rules and regulations. These claims were presented in the plaintiffs' second substitute complaint, and are discussed later in this opinion.

complaint with the affirmative action commission, they had failed to exhaust their administrative remedies for that claim. Accordingly, the trial court concluded that the plaintiffs had no cause of action for an alleged violation of the city's affirmative action plan.

The trial court agreed with the plaintiffs that underfilling is illegal because it violates the city's charter. First, the trial court concluded that underfilling constitutes a "transfer" as defined by § 60[14] of the city's charter because it shifts funds from one line item of the budget to another. Next, the trial court concluded that, because the city's charter requires that transfers must be approved by the board of aldermen, and because there was no dispute that the board of aldermen did not approve the transfers in the present case, the defendants' use of underfilling violated the city's charter. The trial court also agreed with the plaintiffs that underfilling violates the city's civil service rules and regulations. Specifically, the trial court concluded that underfilling is inconsistent with rule VI[15] of the civil service rules

[14] Section 60 of the city's charter provides: "The board of aldermen may establish by ordinance from time to time an amount of appropriation under the approved budget which the controller with the approval of the mayor shall be authorized to transfer between line items within any department or from one department to another. No such transfer in excess of such authorized amount shall be implemented unless it shall be proposed by the mayor and approved by the board of aldermen, provided that an increase in the total appropriation shall be approved only by vote of two-thirds of the entire board of aldermen. Each approved transfer shall be described in the monthly financial report prepared by the mayor pursuant to section 62."

[15] Rule VI of the city's civil service rules and regulations, which is entitled "Method of Filling Vacancies," provides in relevant part: "Written requests for eligible lists shall be made to the Civil Service Board by the appointing authority whenever:

"(a) A vacancy occurs

"(b) Additional employees are required (as approved by the Board of Finance)

"(c) A vacancy is anticipated . . . .

"All vacancies in the classified service shall be filled by re-employment, transfer, or from an appropriate promotional or eligible list, if available. When no Civil Service list of eligibles exists for a particular class, the Board of Finance may fill any vacancy in such class by a temporary appointment

and regulations because the fire department treated underfilled lieutenants as permanent employees,[16] even though the board of finance, which is now the finance committee of the board of aldermen, as required by the civil service rules and regulations, did not approve the promotions. The trial court also noted that the underfilled lieutenants could not properly be classified under the civil service rules and regulations as temporary employees.[17] The trial court, therefore, found that the practice of underfilling was illegal, and permanently enjoined the defendants from engaging in the practice of underfilling. In addition, the trial court appointed a special master to oversee promotions within the fire department. This appeal and cross appeal followed.

Thereafter, the plaintiffs filed a motion for contempt against the city, claiming that the fire department had violated the trial court's order because, subsequent to that order, it had funded the hiring of entry-level trainees through the practice of underfilling. Specifically, the plaintiffs alleged that the fire department had hired thirty entry-level trainees, even though only twenty-seven vacancies existed for those positions in the city's budget. After an evidentiary hearing on the matter, the trial court concluded that, although the funding of new

for not more than ninety (90) working days; and within that period, the Civil Service Board shall hold examinations of candidates for the class. . . ."

[16] The city's civil service rules and regulations define "[p]ermanent [e]mployee" as: "An employee who has . . . been permanently appointed to a position in the classified service by the Appointing Authority, and approved by the Board of Finance."

[17] The city's civil service rules and regulations define "[t]emporary [a]ppointment" as: "The appointment of a temporary employee to a position in the classified service by the Board of Finance for a period not to exceed 90 working days pending Civil Service examination."

In addition, § 175 of the city's charter provides that "[t]he personnel director, when the interests of the city require, shall have the authority to extend a temporary appointment for a period of ninety days but shall not exercise this power more than once in the case of any given appointee." Thus, any particular temporary appointment cannot exceed 180 days.

hires through underfilling violated its prior order, it denied the motion for contempt. The trial court reasoned that the violation was not wilful because the city rationally could have perceived that the previous order pertained only to promotions among ranks, and not to new hires. The trial court, however, expanded the duties of the special master to oversee, not only promotions made within the ranks, but also the hiring of entry-level trainees. The defendants filed an amended appeal, challenging the trial court's ruling expanding the duties of the special master. Additional facts and procedural history will be presented as necessary.

The issues on appeal before this court, as phrased by the parties, are too numerous and convoluted to introduce at the outset. Instead, we begin with the defendants' claims on appeal, which will be discussed in part I of this opinion. The plaintiffs' cross appeal will be discussed in part II of this opinion. The claims of the intervening defendant will be discussed as necessary.[18]

I

THE DEFENDANTS' APPEAL

The defendants claim, among other things, that: (1) the plaintiffs lack standing to challenge the defendants' use of underfilling; (2) the trial court improperly concluded that underfilling violates the city's charter, municipal ordinances and the civil service rules and regulations; (3) the trial court abused its discretion when it appointed a special master to oversee promotions within the fire department; and (4) the trial court improperly expanded the duties of the special master to

---

[18] The intervening defendant addresses only the issue, which was raised in the plaintiffs' cross appeal, of whether the trial court properly refused to void all promotions made though the practice of underfilling, and it argues that the judgment of the trial court should be affirmed.

oversee the hiring of entry-level trainees.[19] We conclude that: (1) four of the six plaintiffs lack standing to challenge the defendants' use of underfilling in the present case; (2) the trial court properly concluded that underfilling is not permissible in the present case; (3) the trial court did not abuse its discretion by appointing a special master to oversee promotions within the fire department; and (4) the trial court improperly expanded the duties of the special master because all of the plaintiffs lacked standing to challenge the hiring of entry-level trainees.

## A

The defendants claim that the plaintiffs lack standing to challenge the defendants' use of underfilling in the present case. First, the defendants claim that all of the plaintiffs lack standing because they failed to challenge administratively the 1996 lieutenants eligibility list. In the alternative, with regard to individual plaintiffs, the defendants contend that Benson, Dolphin and Pettaway lack standing because they never sat for the 1998 captains examination. In addition, the defendants contend that Broadnax and Texeira lack standing because they were promoted to lieutenant through the practice of underfilling, thereby actually benefiting from the practice. Finally, the defendants contend that Brantley lacks standing because, although he was promoted to lieutenant without the use of underfilling, he scored too low on the 1998 captains examination to have been promoted to captain. We conclude that Benson, Broadnax, Dolphin and Pettaway each lack standing to challenge the defendants' use of underfilling in the present case; Brantley and Texeira have sufficient standing. We also conclude, however, that *all* of the plaintiffs lack stand-

---

[19] The defendants present several other issues on appeal, many of which are either encapsulated in, or will be disposed of through, these major issues. Accordingly, we will discuss any remaining issues, not mentioned here, throughout part I of this opinion.

ing to challenge the use of underfilling as a means of funding new hires within the fire department.

The following additional facts are necessary to resolve the issue of standing.[20] At the commencement of the litigation underlying these appeals, Brantley, Broadnax and Texeira had achieved the rank of lieutenant; Benson and Pettaway had achieved the rank of firefighter; and Dolphin had achieved the rank of firefighter/emergency medical technician. In September, 1995, Benson, Brantley, Broadnax and Texeira sat for the lieutenants examination; neither Dolphin nor Pettaway, however, sat for that examination. The results of the September, 1995 lieutenants examination were certified on January 22, 1996, and the names of those individuals who passed that examination were posted, in rank order, on lieutenants eligibility list No. 96-02. Benson, Brantley, Broadnax and Texeira all passed the examination: Brantley's score (92) was the third highest score (tied with two others); Texeira's score (86) was seventeenth (tied with two others); Broadnax's score (79) was twenty-seventh (tied with four others); and Benson's score (76) was forty-fourth (tied with two others).[21]

According to the plaintiffs' exhibits, and as agreed to by the defendants, a total of forty individuals were

[20] After oral argument before this court, we ordered the parties to submit supplemental briefs on the issue of standing, and the parties complied with that order.

[21] The parties do not dispute that the fire department promotes in rank order from the eligibility lists. See footnote 9 of this opinion. Thus, based on the rank order established by lieutenants eligibility list No. 96-02, the plaintiffs were slated to be promoted, not taking into account seniority, as follows: Brantley could have been either the third, fourth or fifth individual promoted; Texeira could have been either the seventeenth, eighteenth or nineteenth individual promoted; Broadnax could have been either the twenty-seventh, twenty-eighth, twenty-ninth, thirtieth or thirty-first individual promoted; and Benson could have been either the forty-fourth, forty-fifth or forty-sixth individual promoted.

promoted to lieutenant from eligibility list No. 96-02: twenty-two individuals, including Brantley and Texeira, were promoted on March 13, 1996; eleven individuals, including Broadnax, were promoted on July 3, 1996; and seven individuals were promoted on October 16, 1996. Benson was never promoted to lieutenant because his score was not among the top forty scores on the lieutenants examination. The defendants contend, and the plaintiffs do not dispute, that sixteen vacancies for lieutenant existed on March 13, 1996. Thus, there is no dispute that the first sixteen individuals listed on eligibility list No. 96-02, one of whom was Brantley, were promoted without the benefit of underfilling. In addition, the defendants concede that four additional vacancies for the position of lieutenant developed sometime between March, 1996, and October, 1996. Thus, there also is no dispute that the next four individuals listed on eligibility list No. 96-02 (i.e., numbers seventeen through twenty), one of whom was Texeira, although originally promoted through the use of underfilling, would have eventually been promoted to lieutenant without the use of underfilling. Finally, there is no dispute that the remaining twenty individuals promoted from eligibility list No. 96-02, one of whom was Broadnax, would not have been promoted to lieutenant if underfilling had not been employed.

In April, 1998, Brantley, Broadnax and Texeira sat for the captains examination. Having never attained the rank of lieutenant, Benson, Dolphin and Pettaway were not eligible to sit for that examination. The results of the April, 1998 captains examination were certified on September 2, 1998, and the names of those individuals who passed that examination were posted, in rank order, on captains eligibility list No. 98-35.[22] Broadnax,

---

[22] The results of the captains examination were first certified on May 27, 1998. After an error was discovered, a corrected eligibility list was certified on September 2, 1998. The error did not affect the results of any of the plaintiffs, and does not affect the issue on appeal.

Texeira and Brantley all passed the examination: Broadnax's score (77) was the thirty-ninth highest score; Texeira's score (76) was fortieth; and Brantley's score (74) was forty-first (tied with one other).[23]

Thereafter, a total of thirty-four individuals were promoted to captain from eligibility list No. 98-35. Broadnax, Texeira and Brantley, of course, were not promoted to captain because their respective ranks on eligibility list No. 98-35 were too low (i.e., greater than thirty-four). Thus, in order to have been promoted to captain from eligibility list No. 98-35, and given their respective ranks on that list, Broadnax, Texeira and Brantley would have needed the fire department to have promoted an additional five, six and eight individuals, respectively. There is no dispute, however, that more than eight individuals who had been promoted to lieutenant from eligibility list No. 96-02 through the use of underfilling (i.e., scored worse than the twentieth [84] on the September, 1995 lieutenants examination) were promoted to captain from eligibility list No. 98-35 *ahead* of Broadnax, Texeira and Brantley. If underfilling had not been employed in 1996, those eight individuals would not have been promoted to lieutenant, and, consequently, would not have been eligible to sit for the May, 1998 captains examination. See footnote 7 of this opinion. Thus, excluding the fact that Broadnax herself was underfilled in 1996,[24] it is clear that Broadnax, Texeira and Brantley would have ranked higher on eligibility list No. 98-35 if underfilling had not been employed,

[23] Thus, on the basis of the rank order established by captains eligibility list No. 98-35, the following plaintiffs, not taking into account seniority, were slated to be promoted: Broadnax was the thirty-ninth individual slated to be promoted; Texeira was the fortieth individual slated to be promoted; and Brantley could have been either the forty-first or forty-second individual promoted.

[24] As will be discussed later in part I A of this opinion, Broadnax never would have been eligible to sit for the April, 1998 captains examination if she had not been underfilled in the first place.

thereby increasing their chances of being promoted to captain.

"If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . .

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that] he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy. . . . The requirement of directness between the

injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue." (Citations omitted; internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 485–86, 815 A.2d 1188 (2003).

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Orange*, 256 Conn. 557, 568, 775 A.2d 284 (2001).

With respect to whether the plaintiffs have demonstrated some legally protected interest, we often have stated: "Standing concerns the question [of] whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. . . . [See] *State* v. *Pierson*, 208 Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989) (standing merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected

or regulated by the statute or constitutional guarantee) . . . ." (Citations omitted; internal quotation marks omitted.) *Med-Trans of Connecticut, Inc.* v. *Dept. of Public Health & Addiction Services,* 242 Conn. 152, 160, 699 A.2d 142 (1997); see also *United Cable Television Services Corp.* v. *Dept. of Public Utility Control,* 235 Conn. 334, 344–45, 663 A.2d 1011 (1995) ("in considering whether a plaintiff's interest has been injuriously affected . . . we have looked to whether the injury he complains of [*his* aggrievement, or the adverse effect *upon him*] falls within the zone of interests sought to be protected" [emphasis in original; internal quotation marks omitted]). In the present case, the plaintiffs claim, among other things, that underfilling violates the city's civil service rules and regulations. In this regard, the plaintiffs have alleged essentially that underfilling undermines the manner in which individuals are promoted within the fire department. "The [civil service] law provides for a complete system of procedure designed to secure appointment to public positions of those whose merit and fitness has been determined by examination, and to eliminate as far as practicable the element of partisanship and personal favoritism in making appointments." (Internal quotation marks omitted.) *Walker* v. *Jankura,* 162 Conn. 482, 490, 294 A.2d 536 (1972). The plaintiffs, as employees of a municipal department governed by the city's civil service rules and regulations, certainly are within the zone of interests that the civil service system was designed to protect, and, as such, have a legally protected interest in the subject matter of the challenged action.[25]

[25] We do not mean to intimate, however, that an individual may, in his or her capacity as a municipal employee, challenge the validity of a promotional practice solely on the basis that it purportedly violates an accounting practice as described in a city charter or other similar document. The rules relating to the city's budget present a different zone of interests than do the city's civil service rules and regulations. Because we conclude that the city's civil service rules and regulations provide the plaintiffs with a legally protected interest in the subject matter of the present case, we do not decide whether the alleged charter violations also would provide such an interest.

We now turn to the second aspect of aggrievement, namely, whether the plaintiffs' legally protected interest has been adversely affected. In the present case, the trial court determined that all of the plaintiffs had standing to challenge underfilling because "underfilling in the [fire] department affects the applicant pool for all promotions." That conclusion set the bar for standing too low, however, because it did not require *each plaintiff* to demonstrate that he or she had been *adversely* affected by the practice of underfilling.[26] Such a generalized interest in the outcome of a proceeding is insufficient to confer standing. By the same token, merely because *some* employees of the fire department may have been adversely affected by underfilling does not mean that *every* employee would have standing to challenge the practice; rather, only those individuals who have suffered a *direct* injury would have standing. See *Frillici v. Westport*, 264 Conn. 266, 281, 823 A.2d 1172 (2003) ("[i]t is axiomatic that a party does not have standing to raise the rights of another").

The crux of the plaintiffs' claim is that underfilling permitted the fire department to promote more individuals to lieutenant than was permitted by the city's applicable provisions regarding promotions; this increased the number of individuals who were eligible to take the April, 1998 captains examination, which thereby diluted the plaintiffs' chances of being promoted to captain.

---

[26] Similarly, we disagree with the plaintiffs' reliance on *New Haven Firebird Society* v. *Board of Fire Commissioners*, supra, 32 Conn. App. 593–94, for the proposition that all of the plaintiffs have standing in the present case. *New Haven Firebird Society* does not inform whether the plaintiffs in the present case have standing. First, although there were individual plaintiffs in that case, the Firebird Society, which is a group that *represents the interests of* minority firefighters, was also a plaintiff. No such representative group exists in the present case. Second, the court in *New Haven Firebird Society* devoted no discussion to the standing of the individual plaintiffs. Finally, the alleged violation in *New Haven Firebird Society* differs from that in the present case.

In other words, the plaintiffs are claiming that, if the defendants' had not engaged in underfilling in 1996, they would have been more likely to have been promoted to captain in 1998.

Three of the plaintiffs, Benson, Dolphin and Pettaway, never sat for the captains examination in April, 1998. Thus, they *never* could have been promoted to captain in 1998, irrespective of underfilling. Although aggrievement may be established by showing that there is a "possibility," as opposed to a "certainty," of a direct injury; (internal quotation marks omitted) *AvalonBay Communities, Inc.* v. *Orange,* supra, 256 Conn. 568; there was not even a *possibility* that Benson, Dolphin and Pettaway could have been promoted to captain. Thus, Benson, Dolphin and Pettaway lack standing to challenge underfilling in the present case.

By the same token, Broadnax was promoted to lieutenant in 1996 through the use of underfilling. If underfilling had not been employed in 1996, she would not have been promoted to lieutenant, which would have made her ineligible to sit for the captains examination in April, 1998. Thus, underfilling did not adversely affect Broadnax's chances of becoming captain in 1998. To the contrary, if Broadnax had not benefited from underfilling in 1996, she would have had *no* chance of being promoted to captain in 1998; with underfilling, she had *some* chance. Because Broadnax actually benefited from underfilling, she lacks standing to challenge it in the present case.[27]

Brantley was promoted to lieutenant in 1996 without the use of underfilling. Similarly, although Texeira initially was underfilled when he was promoted to lieutenant in 1996, the defendants concede that he would have

[27] Our conclusion that Benson, Broadnax, Dolphin and Pettaway lack standing to challenge underfilling makes it unnecessary to address the defendants' claim that some of those plaintiffs "lack 'clean hands' . . . ."

been promoted had underfilling not been employed because vacancies for that position eventually developed. The defendants also concede that several underfilled lieutenants, who scored higher than Brantley and Texeira on the 1998 captains examination, were promoted to captain ahead of, and instead of, Brantley and Texeira. Thus, if underfilling had not been employed in 1996, Brantley and Texeira would have been promoted to captain in 1998. This is sufficient to establish aggrievement because underfilling injuriously affected an interest specific to Brantley and Texeira, namely, their capacity to attain the rank of captain. Accordingly, Brantley and Texeira have standing to challenge underfilling in the present case.[28]

The defendants contend, nonetheless, that all of the plaintiffs lack standing because they failed to challenge administratively lieutenants eligibility list No. 96-02. That argument fails because it misconstrues the plaintiffs' claim in the present case. The plaintiffs have not challenged the propriety of the 1996 lieutenants eligibility list; rather, they simply contend that, due to underfilling, too many individuals were promoted from that list. Challenging eligibility list No. 96-02 would not have furthered the plaintiffs' position.

We also disagree with the defendants' contention that the plaintiffs' failure to demand that underfilled lieutenants should not be permitted to sit for the 1998 captains examination somehow precludes them from challenging the subsequent promotions to captain. In that regard, the defendants contend that the plaintiffs have failed to exhaust their administrative remedies. The defendants, however, have not cited, nor are we aware of, any administrative method for preventing an individ-

---

[28] Because we conclude that some of the plaintiffs have standing in the present case, we are able to reach the merits of the plaintiffs' claims regarding the legality of underfilling.

ual from sitting for a civil service examination. In addition, in determining whether the prerequisites for a declaratory judgment have been met in the present case, the trial court specifically determined that "this [court] is the most efficacious forum for the determination of the issues . . . ." See Practice Book § 17-55.[29] The defendants have not challenged that determination, and we see no reason to disturb it.

Finally, we are not persuaded by the defendants' reliance on *Honis* v. *Cohen*, 18 Conn. App. 80, 84, 556 A.2d 1028 (1989), for the proposition that the plaintiffs were required to have challenged the results of the April, 1998 captains examination sooner. In *Honis*, the plaintiffs, who were members of the Bridgeport police department, claimed that the names of certain individuals should have been removed from the sergeants eligibility list because they had not met the department's residency requirements. Id., 82–84. The plaintiffs in *Honis*, however, did not challenge the results of the sergeants eligibility list until after its expiration. Id., 84. The court in *Honis* concluded that, because the plaintiffs did not challenge the eligibility list in a timely fashion (i.e., before it had expired), they could not prevail in a declaratory judgment action challenging that list. Id. In the present case, however, the plaintiffs brought this action well before the expiration of captains eligibility list No. 98-35. Thus, we cannot say that

---

[29] Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met:

"(1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations;

"(2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and

"(3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

the plaintiffs were required to bring their action any sooner than they did.

We now turn to the trial court's subsequent judgment expanding the duties of the special master to oversee the hiring of entry-level trainees. We conclude that *all* of the plaintiffs lack standing to challenge the use of underfilling as a means of funding new hires within the fire department. As previously discussed, the plaintiffs claimed that the city had violated the trial court's order because the fire department hired thirty entry-level trainees, even though only twenty-seven vacancies existed in the city's budget. None of the plaintiffs has claimed, however, that the hiring of these entry-level trainees has adversely affected them in any way. Thus, they have not been aggrieved by this practice, and they lack standing to challenge it. Because the plaintiffs lack standing, the trial court and this court lack jurisdiction to determine whether hiring these thirty entry-level trainees violated the trial court's prior order, or whether it constituted underfilling as defined by the trial court. Accordingly, the portion of the judgment of the trial court expanding the duties of the special master must be reversed, and we do not address any other claims of the parties that pertain to that issue.

B

We now turn to the question of whether the defendants' use of underfilling was permissible in the present case. The defendants claim that the trial court improperly concluded that underfilling violated the city's charter, its municipal ordinances and its civil service rules and regulations. We disagree.[30]

We first set forth the standard of review that governs this issue. As with any issue of statutory construction,

---

[30] This conclusion makes it unnecessary for us to consider the plaintiffs' claim that underfilling violates the city's affirmative action plan.

the interpretation of a charter or municipal ordinance presents a question of law, over which our review is plenary. *Fennell* v. *Hartford*, 238 Conn. 809, 826, 681 A.2d 934 (1996); see *Alexander* v. *Retirement Board*, 57 Conn. App. 751, 759, 750 A.2d 1139, cert. denied, 254 Conn. 902, 755 A.2d 217 (2000). "In construing a city charter, the rules of statutory construction generally apply. . . . In arriving at the intention of the framers of the charter the whole and every part of the instrument must be taken and compared together. In other words, effect should be given, if possible, to every section, paragraph, sentence, clause and word in the instrument and related laws." (Internal quotation marks omitted.) *Fennell* v. *Hartford*, supra, 826.

In addition, the present case involves the city's civil service system, and we previously have emphasized the importance of maintaining the integrity of that system. "Statutory provisions regulating appointments under civil service acts are mandatory and must be complied with strictly. . . . The [civil service] law provides for a complete system of procedure designed to secure appointment to public positions of those whose merit and fitness has been determined by examination, and to eliminate as far as practicable the element of partisanship and personal favoritism in making appointments. . . . A civil service statute is mandatory as to every requirement." (Citation omitted; internal quotation marks omitted.) *Walker* v. *Jankura*, supra, 162 Conn. 489–90; see also *Meyer* v. *Collins*, 49 Conn. App. 831, 837, 717 A.2d 771 (1998).

Finally, "[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find sup-

port in the facts that appear in the record."[31] (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 329, 838 A.2d 135 (2004).

Although the trial court addressed the provisions of the city's charter and ordinances separately from the city's civil service rules and regulations, we address those sources together because many of the provisions overlap and are interrelated. In this regard, we begin our discussion with the city's budget because it provides a helpful background in understanding the manner in which individuals are promoted within the city's various departments. As previously discussed, the city's budget is approved by the board of aldermen on a line-by-line basis. The annual budget for the fire department comes from the city's general fund, which provides the funding for a majority of the city's departments. Within the general fund, under the heading "Fire Services," salaries for the firefighters are contained in the line item "Salaries Permanent."[32] That line item represents the sum total of the salaries listed in the personnel budget for the fire department. The personnel budget contains a listing of all the salaried positions (i.e., lieutenant, cap-

---

[31] The trial court based its conclusion that underfilling violates the city's charter and civil service rules and regulations on the language of the provisions at issue, as well as on the testimony of various witnesses interpreting those provisions. In their briefs, the parties repeatedly refer to the testimony of those witnesses in support of their respective positions. Despite these references, however, neither the plaintiffs nor the defendants have provided this court with the transcripts of the trial court proceedings. Accordingly, we confine our review to the facts as found by the trial court, and, with respect to facts not expressly found by the trial court, our review is limited to those facts to the extent that they are not in dispute. We stress our dissatisfaction with the performance of the parties' counsel in this regard.

[32] The budget for the fire department is broken down into separate headings, for instance, "Administration & Training," and "Investigation & Inspection." Each of these headings has a separate line item for "Salaries Permanent." The salaries for the firefighters, including the plaintiffs, are listed under the heading "Fire Suppression & EMS."

tain, battalion chief), with their corresponding maximum salary. Each particular position is listed separately with its own account number.[33] Thus, although each salaried position does not represent a separate line item in the general fund, they are listed as separate line items in the personnel budget—and the sum total of the personnel budget appears as a line item in the general fund.

The trial court concluded that underfilling constituted a "transfer" in violation of § 60 of the city's charter. Section 60 of the city's charter provides in relevant part: "The board of aldermen may establish by ordinance from time to time an amount of appropriation under the approved budget which the controller with the approval of the mayor shall be authorized to transfer between line items within any department or from one department to another. . . ." This language makes clear that, in order for funds to be transferred from one line item to another, the board of aldermen must initiate the process and receive mayoral approval for the transfer to take place, and there is no dispute that neither the board of aldermen nor the mayor approved the use of underfilling in the present case.[34]

---

[33] To be clear, each position listed in the personnel budget represents one employee's salary, irrespective of whether that position is vacant or filled. For example, if the personnel budget lists twenty-five captains and fifty lieutenants, one will see seventy-five separate lines, each with its own account number: twenty-five lines representing the captains; and fifty lines representing the lieutenants.

[34] There is an ambiguity, however, as to whether transferring funds from one salaried position to another constitutes a transfer between *line items* in the budget as defined in § 60 of the city's charter. Similarly, it is not clear whether each salaried position, i.e., captain or lieutenant, constitutes one line item, or whether only the sum total of those salaries constitutes one line item. In this regard, in appendix I of the city's budget, which is entitled "General and Special Fund Line Item Detail," each salaried position does *not* appear as a separate line item; rather, only a sum total of the budgeted salaries appears in the line item "Salaries Permanent." In order to view each salaried position as a line item, one must consult appendix II of the city's budget, which is entitled "General and Special Fund Personnel." As the foregoing discussion indicates, however, irrespective of how one scrutinizes

In addition, § 2-190 of the New Haven Code provides: "Prior approval by order of the board of aldermen shall be required for a transfer of appropriation or other action if the effect of such action would be one (1) or more of the following: (a) To create a position not included in the budget as adopted, or to reclassify a position so included. . . ." This language plainly provides that the board of aldermen must approve any action that creates a position not included in the approved budget. As previously discussed, each particular salaried position, i.e., captain, is assigned its own account number and is listed separately in the personnel budget. Therefore, the budget, as approved by the board of aldermen, authorizes a specific number of salaried positions at each rank. In the present case, there is no dispute that the fire department promoted more individuals to lieutenant than the city's budget had provided. In this regard, although the city's budget approved only a specific number of lieutenants, the fire department employed *additional* lieutenants, i.e., positions that were not listed in the budget. The only plausible conclusion, therefore, is that, by engaging in the practice of underfilling, the fire department "create[d] a position not included in the budget as adopted," without receiving prior approval of the board of aldermen, in violation of § 2-190 (a) of the New Haven Code.

This conclusion is consistent with the city's civil service rules and regulations, which contemplate that a particular position must be vacant in order for an individual to be promoted to that position. Rule X of the civil service rules and regulations, which is entitled "Promotions," provides: "Vacancies in higher positions

---

the term "line items" as it is used in § 60 of the city's charter, it is clear that underfilling is not compatible with the city's municipal ordinances and civil service rules and regulations. We make this observation only because, contrary to the trial court's determination, we cannot say, on the basis of this record, whether underfilling constitutes a "transfer" as defined by § 60 of the city's charter.

in the classified service of the City shall as far as practicable be filled by promotion[35] from lower classes upon the basis of competitive tests including a consideration of service ratings, provided that in case no persons in the classified service meet the necessary qualifications or it is deemed to the best interests of the City, the Civil Service Board may direct that such position be filled by competitive tests open to any qualified persons . . . ."[36] In addition, rule VI of the civil service rules and regulations, which is entitled "Method of Filling Vacancies," provides in relevant part: "Written requests for eligible lists shall be made to the Civil Service Board by the appointing authority whenever: (a) A vacancy occurs (b) Additional employees are required (as approved by the Board of Finance) (c) A vacancy is anticipated . . . . All vacancies in the classified service shall be filled by re-employment, transfer,[37] or from an appropriate promotional or eligible list, if available. When no Civil Service list of eligibles exists for a particular class, the Board of Finance may fill any vacancy in such class by a temporary appointment for not more

---

[35] The civil service rules and regulations define "[p]romotion" as: "advancing an employee from a position in one class to a position in another class having a higher maximum salary range."

[36] This provision is mirrored in § 170 of the city's charter, which provides: "Vacancies in higher positions in the classified service of the city shall as far as practicable be filled by promotion from lower classes upon the basis of competitive tests including a consideration of service ratings; provided that in case no persons in the classified service meet the necessary qualifications, the director of personnel may direct that such position shall be filled by competitive tests open to any qualified persons."

[37] The civil service rules and regulations define "[t]ransfer" as: "The assignment of an employee from one position to another position in division or department having similar duties and carrying the same minimum and maximum salary as the position from which assignment is made." The parties do not claim that underfilling constitutes this type of transfer. By the same token, the term "transfer," as defined by the civil service rules and regulations, is not equivalent to the term "transfer," as discussed in § 60 of the city's charter. Whereas the charter is concerned with transferring *funds* from one line item to another in the budget, the rules are concerned with transferring *persons* from one department to another.

than ninety (90) working days; and within that period, the Civil Service Board shall hold examinations of candidates for the class. . . ." The provisions regarding promotions and vacancies, therefore, make clear that, when a vacancy occurs, written requests for eligible lists shall be made, and, with the exceptions of reemployment and transfers, neither of which is applicable in the present case, vacancies are to be filled by promoting individuals from valid civil service eligibility lists.

This language also makes clear that the triggering event to allow for promotions, as is relevant in the present case, is that there be a vacancy for the higher class. Significantly, the civil service rules and regulations define "[v]acancy" as: "A position existing or newly created which is not occupied *and for which funds are available.*" (Emphasis added.) Thus, in order to have a vacancy to trigger the promotional process, not only must the position be unoccupied, but there also must be funds available to pay for the new appointment. This strongly suggests that the higher ranking position must be listed in the personnel budget along with the corresponding salary for that position, and that that salary be "available" for that position.

In the present case, there is no dispute that, in 1996, individuals were promoted to lieutenant, and because there were no vacancies for lieutenants remaining in the budget, the newly appointed lieutenants were paid salaries from vacant captain positions, albeit at the usual lieutenants salary. Thus, individuals were promoted to positions for which no vacancy, as defined by the civil service rules and regulations, existed. This practice runs counter to the civil service rules and regulations, which suggest that a promotion must be predicated upon the occurrence of a vacancy. Indeed, accepting the contrary position that underfilling is permissible would allow the fire department to promote individuals so long as it does not exceed its total bud-

geted salary expense, irrespective of which positions are vacant. Such a notion makes little sense in a system wherein the board of aldermen is required to approve a budget that specifically authorizes a certain number of positions at each class.[38]

Indeed, the trial court credited the testimony of David Colesworthy, fiscal analyst for the board of aldermen, who indicated that underfilling deprives the board of aldermen of the oversight it exercises over the budget.[39] In this regard, Colesworthy explained that if the fire department is requesting funds for a number of higher paid positions, but filling those positions with lower paid positions, then the fire department is holding onto more funds than it needs to finance its annual salary expense. Those excess funds, according to Colesworthy, could be allotted elsewhere by the board of aldermen, or could provide a basis to cut taxes; or, of course, each instance of underfilling could be approved by the

[38] In this regard, we are not persuaded by the defendants' contention that underfilling is permissible because "there is no *general* restriction on paying a lesser amount than budgeted and no *general* restriction on reallocating monies estimated for one job title to another." (Emphasis in original; internal quotation marks omitted.) Although it may be permissible, *as a general matter*, to pay a lesser amount than that listed in the budget, it is not permissible under the *specific* provisions at issue in the present case.

[39] We reject the defendants' contention that it was "plain error" for the trial court to rely on Colesworthy's testimony. The defendants cite no authority to support this proposition; instead, the defendants primarily maintain that Colesworthy's testimony was contradicted by other evidence presented in the trial court. The short answer to this contention is that it was within the trial court's discretion to credit the testimony of Colesworthy. See *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" [internal quotation marks omitted]). In addition, and as previously discussed; see footnote 31 of this opinion; the parties have failed to provide this court with transcripts from the trial. We would be hard pressed to conclude, as a matter of law, and without the benefit of reviewing the other witnesses' testimony, that the trial court improperly relied on the testimony of a particular witness.

board of aldermen. The point is that the board of aldermen never made that decision.

Lawrence Rusconi, a public accountant who testified as the city's expert, expressed similar concerns. Rusconi opined that underfilling is neither an appropriate accounting practice nor management tool. In addition, according to Rusconi, the unexpended funds resulting from underfilling would be welcomed by the city at the end of the fiscal year.

We are mindful that the fire department was faced with a difficult task in appointing enough firefighters properly to oversee the city. We also are mindful that the fire department promoted individuals in standard rank order from the 1996 lieutenants eligibility list, and that, on the basis of this record, there was no evidence that the fire department selectively promoted some individuals and not others. Nonetheless, "[g]ood faith of the parties will not validate an illegal appointment and will not be sanctioned by the courts. . . . It is mandatory that every requirement of the civil service law be followed, and proof that substantial compliance exists is not enough. . . . [Anything less] would open the door to abuses which the law was designed to suppress." (Citation omitted; internal quotation marks omitted.) *Resnick* v. *Civil Service Commission*, 156 Conn. 28, 32–33, 238 A.2d 391 (1968).

Furthermore, Rusconi acknowledged that the charter allows for the fire department to appoint employees without approval from the board of aldermen, but only on a temporary basis for a period not to exceed 180 days. See footnote 17 of this opinion. The fire department was free to appoint employees on such a temporary basis in lieu of underfilling; or, as the trial court noted, nothing prevented the fire department from simply obtaining approval from the board of aldermen for each underfilled promotion.

Nonetheless, the defendants maintain that, the board of aldermen was aware that the fire department was utilizing underfilling and took no action to prohibit it. The defendants, however, have not indicated why the awareness of the board of alderman somehow validates the practice, nor have the defendants cited any authority to support such a proposition. Even if we were to assume that the board of aldermen was, in fact, aware of the practice, the provisions at issue require *the formal approval*, as opposed to the informal acquiescence, of the board of aldermen, and it is undisputed that the defendants had not obtained such approval in the present case.[40]

## C

Having concluded that underfilling was not permissible in the present case, we now turn to the propriety of the relief awarded by the trial court. The defendants claim that the trial court abused its discretion when it appointed a special master to oversee promotions within the fire department. Specifically, the defendants maintain that the appointment of a special master is "not legal" in the present case because such an appointment is reserved only for "extraordinary circumstances . . . ." We disagree.

[40] The defendants also argue that the "New Haven Department of Fire Services is not a separate entity capable of being sued in its own name." Citing the city's charter, the defendants' argument begins and ends with the sentence: "Only the city of New Haven has been designated as 'a person in law capable of suing and being sued.'" Indeed, article I, § 1, of the charter provides in relevant part: "[T]he 'City of New Haven' . . . shall be a person in law capable of suing and being sued . . . ." Unfortunately, even if we assume that this language is applicable to the present case, we do not understand how that language indicates that *only* the city may be sued, partly because the text does not say that, and also because the defendants have not bothered to explain why. "We are not required to review issues that have not been adequately briefed and have therefore been improperly presented to this court." *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 732–33 n.11, 830 A.2d 228 (2003).

"As an initial matter, we note that a trial court is vested with broad authority to fashion equitable relief." *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 94, 752 A.2d 1037 (1999). "A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted; internal quotation marks omitted.) *Tighe* v. *Berlin*, 259 Conn. 83, 87–88, 788 A.2d 40 (2002).

In the present case, the trial court appointed a special master to oversee promotions within the fire department. The trial court noted that this is the third occasion that the fire department's personnel practices have come under judicial scrutiny. The defendants have not cited any authority indicating that the trial court was prohibited from appointing a special master in the present case; rather, the defendants point to the lack of express authority for such an appointment.[41] In addition, the defendants do not challenge any particular aspect of the special master's duties, nor do the defendants allege that the appointment has caused them any harm; instead, the defendants simply contend that the appointment was "not legal." Although a court ordinarily should be cautious about appointing a special master to oversee the actions of a governmental entity, considering the broad discretion given to the trial court

---

[41] In this regard, unlike the Federal Rules of Civil Procedure, our rules of practice do not set forth provisions applicable to the appointment of a special master. Rule 53 (a) (1) (C) of the Federal Rules of Civil Procedure, however, permits a court to appoint a special master to "address pretrial and post-trial matters that cannot be addressed effectively and timely by an available . . . judge . . . ." Thus, at least under the federal rules, the appointment of the special master in the present case arguably would qualify as a valid appointment to address a posttrial matter.

in granting equitable relief, the litigious history of the city and its fire department, and the lack of authority to support the defendants' claim, we cannot say that the trial court abused its discretion in appointing a special master in the present case.

## II

## THE PLAINTIFFS' CROSS APPEAL

On their cross appeal, the plaintiffs claim that the trial court improperly: (1) granted the defendants' motion to strike their claims alleging violations of their federal and state constitutional rights; (2) failed to void retroactively all promotions made through the process of underfilling; and (3) failed to award attorney's fees to the plaintiffs. With regard to the plaintiffs' first claim, we conclude that the trial court improperly struck the plaintiffs' claim alleging a violation of their federal equal protection rights. We also conclude, however, that we have no basis on which to disturb the trial court's ruling striking the remainder of the plaintiffs' claims alleging violations of their federal and state constitutional rights. Finally, we reject the plaintiffs claims regarding the trial court's failure to void promotions made through underfilling and its failure to award attorney's fees.

## A

We first turn to the plaintiffs' claim that the trial court improperly granted the defendants' motion to strike their claims alleging violations of their due process and equal protection rights under the federal and state constitutions. We conclude that the trial court improperly granted the defendants' motion to strike the plaintiffs' claim alleging a violation of their equal protection rights. With regard to the plaintiffs' remaining claims, however, we conclude that, because the plaintiffs have not challenged the trial court's judgment with respect to their claims under the federal due process clause

and the state constitution, the trial court's judgment with regard to those claims must stand.

The following additional facts are necessary to resolve this issue. In their substitute complaint, the plaintiffs alleged: "The additional lieutenants, who were all Caucasian of race and white of color, were promoted to their positions by virtue of the promotional practice of underfilling. . . . By allowing the improper, highly manipulative and subjective practice of underfilling to continue, the defendants have effectively so diluted the pool of eligible candidates for promotional positions within the [d]epartment that the plaintiffs' opportunity to be promoted have been unfairly and adversely affected, resulting in their respective chances for promotional advancement being unfairly, substantially and discriminatorily diminished. Conversely, by virtue of the practice of underfilling, Caucasian, white firefighters of varying ranks, who are similarly situated to the plaintiffs have disproportionately benefitted with respect to promotions within the [d]epartment. . . . Each of the plaintiffs have a constitutionally protected property interest in having an employment environment generally free of discrimination . . . . Each of the plaintiffs has been discriminated against by the defendants because of their race which is African-American and their color which is black as the practice of underfilling has, by and large, disproportionately favored Caucasian, white firefighters of varying ranks throughout the [f]ire [d]epartment with respect to obtaining promotions. . . . As a result of the actions of the defendants, the plaintiffs have been denied due process and/or the equal protection of laws in direct violation of §§ 1981 and 1983 of [t]itle 42 of the United States Code. . . . The aforedescribed actions of the defendants constitute clear violations of the plaintiffs' state constitutional rights found within the Connecticut [c]onstitution, including [a]rticle [f]irst, §§ 1 and 10."

With regard to the plaintiffs' due process claim, the trial court concluded that there is no constitutionally protected property interest in having an employment generally free from discrimination. With regard to the plaintiffs' equal protection claim, the trial court concluded that, because the plaintiffs have not alleged *intentional* discrimination, their claim under the equal protection clause must fail. With regard to the plaintiffs' state constitutional claims, the trial court concluded that the due process and equal protection provisions of the state constitution are coextensive and impose the same limitations as does the federal constitution. Accordingly, the trial court struck the plaintiffs' claims alleging violations of both the federal and state constitutions.

"A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly, rather than narrowly." (Citation omitted; internal quotation marks omitted.) *Craig* v. *Driscoll*, 262 Conn. 312, 321, 813 A.2d 1003 (2003).

In this regard, "we long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to

the general theory upon which it proceeded, and do substantial justice between the parties. . . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Citation omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 268 Conn. 463, 466 n.4, 845 A.2d 389 (2004).

Before turning to the merits of the plaintiffs' claim, we reiterate that only Brantley and Texeira have standing to challenge the defendants' use of underfilling in the present case. The other plaintiffs were not aggrieved by the practice, and, therefore, lack standing to challenge it. See part I A of this opinion. Accordingly, we address the plaintiffs' claims only as they relate to Brantley and Texeira.

As previously discussed, the trial court struck the plaintiffs' claims alleging a violation of the federal equal protection clause because the plaintiffs did not allege "that the defendants intentionally or purposefully discriminated against the plaintiffs . . . ." The plaintiffs' complaint stated, however, that: (1) all of the new lieutenants promoted through the process of underfilling were Caucasian; (2) "by virtue of the practice of underfilling, Caucasian, white firefighters . . . disproportionately benefited with respect to promotions within the [d]epartment"; and (3) "[e]ach of the plaintiffs has been discriminated against by the defendants because of their race . . . ." We conclude that this language, when read in the context of the entire complaint, reasonably can be read as indicating that the defendants intentionally used underfilling as a means

of promoting additional Caucasian firefighters.[42] To the extent that the trial court's conclusion rested on the notion that the plaintiffs failed to allege *intentional* discrimination, that conclusion, at least for the purpose of a motion to strike, cannot stand. Accordingly, we conclude that the trial court improperly struck this claim.[43]

With regard to the remainder of the plaintiffs' claims, however, the plaintiffs do not present any substantive legal arguments regarding why their claims sufficiently stated a cause of action; rather, the plaintiffs simply argue that "the trial court failed to construe the allegations contained in the complaint in the manner most favorable to sustaining its legal sufficiency," and that the complaint "should have been construed broadly and realistically, rather than narrowly and hyper-technically." Although these are correct statements of law, they do not address, nor do they even challenge, the legal conclusions reached by the trial court. "We ordinarily decide appeals on the basis in which [they were] decided in the trial court, and briefed and argued in this court." *Wentland* v. *American Equity Ins. Co.*, 267 Conn. 592, 602, 840 A.2d 1158 (2004). In addition, we are not obliged to review claims that are not adequately

---

[42] It may well be that the plaintiffs will have difficulty proving this allegation, however, because it is undisputed that: (1) contrary to the plaintiffs' complaint, *not all* of the new lieutenants promoted through the process of underfilling were Caucasian; and (2) the defendants promoted individuals in standard rank order. We leave that question, however, to the proof to be adduced at trial.

[43] The defendants argue that "a claim of denial of equal protection due to a 'disparate impact' is available only under [t]itle VII of the Civil Rights Act of 1964, as amended, and [the] plaintiffs never exhausted the mandatory administrative remedies that are a predicate to suing under that statute." In addition to the defendants inadequate briefing of that contention, that issue was not decided by the trial court, and we decline to review it. See *Wentland* v. *American Equity Ins. Co.*, 267 Conn. 592, 602, 611, 840 A.2d 1158 (2004) (declining to review claim that was neither adequately briefed nor decided in trial court).

briefed. See id., 611; *Commissioner of Social Services v. Smith*, 265 Conn. 723, 732–33 n.11, 830 A.2d 228 (2003). Accordingly, the trial court's conclusions with respect to the plaintiffs' claims under the federal due process clause and the state constitution must stand.[44]

## B

We now turn to the plaintiffs' claim that the trial court improperly failed to void retroactively all promotions made through the process of underfilling.[45] We reject this claim.

We reiterate that "a trial court is vested with broad authority to fashion equitable relief"; *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 94; and that "unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citation omitted; internal quotation marks omitted.) *Tighe* v. *Berlin*, supra, 259 Conn. 87–88. We conclude that the trial court did not abuse its discretion by not voiding all promotions made through the process of underfilling.

The promotions to lieutenant at issue in the present case took place in March, July and October, 1996, and the trial court did not issue its judgment until February, 2002. Thus, by the time a judgment was rendered in the present case, the individuals who had been promoted to lieutenant through underfilling, some of the plaintiffs included, had been accustomed to the privileges of the higher ranking position for several years. Moreover, some of those individuals were subsequently promoted. Finally, we emphasize that the promotions at issue were made from a valid civil service list in standard rank

---

[44] We express no opinion as to the correctness of the trial court's conclusions; rather, we simply accept those conclusions for the purposes of this appeal because the plaintiffs have not adequately challenged them.

[45] For the purposes of this issue, we assume that such a remedy was within the discretion of the trial court.

order, and, so far as we can tell, the individuals promoted did not play any role in the fire department's decision to utilize underfilling as a means of funding promotions. Thus, if the trial court were to have voided all of the promotions made through underfilling, it effectively would have invalidated the last six or so years of each individuals' professional lives, on the basis of a budgetary practice in which those individuals had not participated.

Finally, as the intervening defendant notes, the plaintiffs did not bring the present action until April, 1998, which was approximately two years after the promotions at issue took place. The plaintiffs filed six complaints in the present action, over the time span between April, 1998, and January, 2001. See footnote 12 of this opinion. Thus, the plaintiffs' actions, by not filing their initial complaint sooner, coupled with the numerous deficiencies contained in their complaints, contributed to the difficulty in the trial court's decision not to grant the requested relief. Accordingly, we cannot say that the trial court abused its discretion by not voiding the promotions at issue in the present case.[46]

---

[46] We are not persuaded by the plaintiffs' reliance on *New Haven Firebird Society* v. *Board of Fire Commissioners*, supra, 32 Conn. App. 592, in support of their contention that the trial court was required to void all promotions made through underfilling. First, although the trial court in *New Haven Firebird Society* did, in fact, void all promotions made through stockpiling, it does not follow that any other contrary action taken by the trial court in that case would have constituted an abuse of discretion. Second, the promotional impropriety in *New Haven Firebird Society* involved promotions that did not take place until after the expiration of civil service eligibility lists. Id., 588. In order for those individuals to have been validly promoted, therefore, they would have been required to sit for another promotional examination. The individuals promoted in the present case, on the other hand, were fully qualified to be promoted, and the only impropriety was due to the budgetary constraints on the fire department. Thus, the present case does not involve a situation that casts doubt as to whether the fire department was, in fact, appointing qualified individuals as required by the civil service system. In this regard, we previously have invalidated civil service eligibility lists when the examination was not administered according to the civil service rules because such action "open[s] the door to abuses

## C

Finally, we address the plaintiffs' claim that the trial court improperly failed to award attorney's fees to them. Specifically, the plaintiffs contend that the trial court abused its discretion by not awarding them attorney's fees as the prevailing party. We reject this claim.

"The general rule of law known as the American rule is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception. . . . This rule is generally followed throughout the country. . . . Connecticut adheres to the American rule. . . . There are few exceptions. For example, a specific contractual term may provide for the recovery of attorney's fees and costs . . . or a statute may confer such rights." (Citations omitted; internal quotation marks omitted.) *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 72–73, 689 A.2d 1097 (1997). This court also has recognized a "bad faith" exception to the American rule, which permits a court to award attorney's fees to the prevailing party on the basis of bad faith conduct of the other party or the other party's attorney. See *Maris* v. *McGrath*, 269 Conn. 834, 844–47, 850 A.2d 133 (2004) (discussing bad faith exception to rule). "[W]e review the trial court's decision to award attorney's fees for abuse of discretion." (Internal quotation marks omitted.) *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 619, 830 A.2d 164 (2003).

We conclude that the trial court did not abuse its discretion by not awarding attorney's fees to the plaintiffs. Even if we were to assume that the plaintiffs were

which the law was designed to suppress." (Internal quotation marks omitted.) *Walker* v. *Jankura*, supra, 162 Conn. 490 (examination not given within required 120 day period); see also *Meyer* v. *Collins*, supra, 49 Conn. App. 836 n.7 (discussing other examples). The promotions in the present case, however, which relate to budgetary matters and not to examination matters, do not fall into the same category and do not give rise to the same concerns.

the "prevailing party" in the present case, the plaintiffs have not cited any statutory or contractual authority that would *permit* an award of attorney's fees, nor have the plaintiffs claimed that the present case falls within any exception to the American rule.[47] Accordingly, the trial court did not abuse its discretion.

The portion of the judgment enjoining the defendants from utilizing the practice of underfilling and appointing a special master to oversee promotions is affirmed; the portion of the judgment expanding the duties of the special master is reversed; the judgment striking the plaintiffs' claims alleging violations of their federal and state constitutional rights is affirmed in part, and reversed in part, and the case is remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.

---

[47] Indeed, the plaintiffs have not bothered to brief this court regarding the general principle that attorney's fees ordinarily are *not* awardable.