SHERYL BROADNAX ET AL. *v.* CITY OF
NEW HAVEN ET AL.
(SC 17971)
(SC 17972)
(SC 18146)

Rogers, C. J., and Katz, Palmer, Zarella and McLachlan, Js.

Argued March 26—officially released December 15, 2009

*Kenneth J. Bartschi,* with whom were *Wesley W. Horton* and *Audrey C. Kramer,* assistant corporation counsel, for the appellants (named defendant et al.).

*W. Martyn Philpot, Jr.*, with whom, on the brief, was *Marc L. Glenn*, for the appellees (plaintiff John R. Brantley et al.).

*Opinion*

ROGERS, C. J. The defendants, the city of New Haven (city), the city's department of fire service (fire department), and the city's board of fire commissioners,[1] appeal[2] from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiffs, John R. Brantley and Christopher Texeira,[3] two African-American firefighters employed by the fire department. The jury found that, by promoting other firefighters through a practice called "underfilling,"[4] the defendants had dis-

[1] On November 3, 1999, the New Haven Firefighters Union Local 825 (union) filed a motion to intervene as a defendant, which the trial court subsequently granted. The union thereafter sought permission to withdraw its appearance and is not a party to these appeals. In addition, the city's civil service commission was listed previously as a defendant in this action, but has not appealed from the judgment of the trial court and is not a party to these appeals.

[2] The defendants appealed, in three separate appeals, from the judgment of the trial court to the Appellate Court, and this court transferred the appeals to itself pursuant to General Statutes § 51-199 (c) and Practice Book §§ 65-1 and 65-2.

[3] The original plaintiffs in this action were Sheryl Broadnax, Ronald Benson, Brantley, and Danny Dolphin, Sr. (original plaintiffs). On June 21, 1999, the trial court granted the original plaintiffs' motion to cite in as additional plaintiffs Clifford Pettaway and Texeira. This court subsequently determined that only Brantley and Texeira had standing to maintain their equal protection claims. *Broadnax* v. *New Haven*, 270 Conn. 133, 157–58, 851 A.2d 1113 (2004). For convenience, we refer to Brantley and Texeira individually by name and collectively as the plaintiffs. We refer to other individuals by name where appropriate. We note that, in the pleadings and transcripts, Texeira's name is occasionally spelled Texiera. For consistency, we use the former spelling in this opinion.

[4] "Underfilling, as the term is used in the present case, occurs when the fire department promotes an individual to a particular position, and the city's budget has not allocated funds to pay the salary of that position, whereby funds for a vacant higher ranking position are used to pay for the newly appointed lower ranking position. For example, if ten individuals are promoted to lieutenant, and only five vacancies exist in the budget for the position of lieutenant, but several vacancies exist in a higher ranking position, such as captain or battalion chief, the first five newly appointed lieuten-

criminated against the plaintiffs on the basis of race in violation of their right to equal protection under the fourteenth amendment to the United States constitution.[5] The dispositive issue in these appeals is whether the trial court improperly denied the defendants' motion to set aside the jury's verdicts because the plaintiffs had failed to present sufficient evidence in support of their equal protection claims.[6] We conclude that the jury reasonably could not have found in favor of the plaintiffs on the basis of the evidence before it and, accordingly, reverse the judgment of the trial court.

This court previously examined the defendants' practice of underfilling in *Broadnax* v. *New Haven*, 270 Conn. 133, 160, 179, 851 A.2d 1113 (2004) (*Broadnax I*), and concluded that the practice of underfilling violates the city's charter, its municipal ordinances and its civil service rules and regulations and affirmed the judgment of the trial court enjoining the city from engaging in the practice prospectively. In *Broadnax I*, this court also reversed the judgment of the trial court striking the plaintiffs' equal protection claims, thereby

ants are promoted and paid with budgeted lieutenant funds, but the next five newly appointed underfilled lieutenants are paid with funds reserved for the vacant captain or battalion chief positions. Thus, when an individual employed at a lower ranking position is paid from funds reserved for a higher ranking position, that individual is considered to have been underfilled." *Broadnax* v. *New Haven*, 270 Conn. 133, 136–37 n.2, 851 A.2d 1113 (2004).

[5] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

[6] The defendants also claim that the trial court improperly: (1) admitted certain evidence introduced by the plaintiffs and excluded other evidence proffered by the defendants; (2) concluded that the plaintiffs had not failed to mitigate their damages; and (3) rendered judgment in favor of Brantley beyond the 120 day time limit set forth in General Statutes § 51-183b. Because the defendants' claim regarding the sufficiency of the evidence is dispositive of these appeals and obviates the need for a new trial, we do not address the defendants' remaining claims.

allowing the trial that is the subject of these appeals to proceed. Id., 173–75; see footnote 24 of this opinion.

The following undisputed facts and procedural history are relevant to the present appeals. "The city and its fire department have been involved in litigation dating back to 1975, when the United States District Court for the District of Connecticut, Zampano, J., ordered the fire department to increase its hiring of minority firefighters on a prescribed timeline with a targeted hiring goal [consent decree]. Thereafter, in 1989, the New Haven Firebird Society (Firebird Society), an organization of minority firefighters, brought an action challenging a practice in the fire department known as 'stockpiling.'[7] See New Haven Firebird Society v. Board of Fire Commissioners, 32 Conn. App. 585, 587–88, 630 A.2d 131, cert. denied, 228 Conn. 902, 634 A.2d 295 (1993). . . . Stockpiling was held to violate the city's charter and civil service rules and regulations because the practice resulted in some promotions actually taking effect after the applicable civil service eligibility list had expired. Id., 592–93. As a result of the litigation by the Firebird Society, the practice of stockpiling was abandoned prospectively, and promotions that had taken effect after the expiration of the eligibility list were judicially invalidated retroactively. Id., 589. This reshuffling of positions, as well as the retirement of other higher ranking firefighters, caused several vacancies in the fire department's command structure, particularly among the ranks of lieutenant and captain. Further, in the years following the trial court's decision in the action brought by the Firebird Society, the fire

---

[7] "Stockpiling is a practice in which individuals are promoted to positions that are not yet vacant, just prior to the expiration of a civil service promotion eligibility list. . . . Persons promoted through stockpiling, however, would not receive the pay, or perform the duties, of the newly acquired position until a vacancy eventually occurred." (Citation omitted.) Broadnax v. New Haven, supra, 270 Conn. 139.

department ceased to administer civil service examinations, which prevented it from filling those vacancies through promotions.

"Promotions within the fire department are governed by the city's civil service rules and regulations, which require individuals to pass an examination before becoming eligible to be promoted to a particular position.[8] After the examination results are calculated, the names of passing candidates,[9] along with their corresponding examination scores, are placed on an eligibility list. Names on the list are arranged in 'rank order,' meaning that the individual with the highest examination score is listed first, followed by names arranged in descending examination score order.

"When a vacancy opens for a particular position, individuals are promoted from the eligibility list in rank order, on the basis of their examination score.[10] For example, if two positions for the rank of lieutenant are vacant, the two individuals who scored the highest on the most recent lieutenants examination, i.e., the two names atop the eligibility list, will be promoted to lieutenant. In this regard, promotions within the fire department are predictable; so long as there is a current eligibility list for a particular position, firefighters know who is next in line to be promoted.

---

[8] "Only individuals who have had at least one year of service at a particular rank are eligible to sit for a promotional examination for the next higher rank. For instance, only lieutenants with at least one year of experience at that rank may sit for a captains examination; only captains with at least one year of experience at that rank may sit for a battalion chiefs examination." Broadnax v. New Haven, supra, 270 Conn. 140 n.7.

[9] "Examination grades are based on a scale of 100 points. Candidates must receive a score of at least 70 percent in order to pass an examination." Broadnax v. New Haven, supra, 270 Conn. 140 n.8

[10] "Although the fire department has the authority to select among the top three individuals from the eligibility list, it has historically promoted in rank order; and in the event that the highest ranking candidates have the same examination score, the most senior of the tied candidates is promoted." Broadnax v. New Haven, supra, 270 Conn. 140 n.9.

"Pursuant to the civil service rules and regulations, eligibility lists expire two years from the date on which they are certified, i.e., the date on which the examination results are officially released. Accordingly, if an eligibility list for a particular position has expired, and the fire department has yet to administer another examination for that position, then the fire department will be unable to promote to that position; until, of course, an examination is administered and a new eligibility list is certified.

"In addition, promotions in the fire department are funded through the city's annual budget. The city's board of aldermen creates the budget, which when passed and signed by the city's mayor, has the force of a city ordinance. When the board of aldermen produces the budget, it does so on a line-by-line basis. Thus, when the budget was enacted for fiscal year 1996–1997, it did not authorize a 'bottom line' for the fire department's funding; rather, the budget specified the number of firefighter personnel authorized to receive pay at each rank and the funds allotted for those positions.

"As previously alluded to, while the fire department was awaiting the finality of the Firebird Society litigation, the fire department refrained from promoting individuals to certain positions, and failed to administer civil service examinations. As a result, the most recent eligibility lists for lieutenant and captain had expired in March, 1988, and December, 1989, respectively. Thus, by the mid-1990s, although the fire department needed to promote firefighters to certain supervisory positions, such as lieutenant and captain, it could not do so until new promotional examinations were administered.

"Martin J. O'Connor was the chief of the fire department from January, 1996, to January, 1998. In order to

fill the fire department's need for additional lieutenants, captains and battalion chiefs, O'Connor requested that civil service examinations be administered for those positions. In September, 1995, a lieutenants examination was administered, and [eligibility list No. 96-02] . . . was certified in January, 1996, expiring in January, 1998. A captains examination, however, was not administered until April, 1998. Thus, in early 1996, even though the fire department needed to fill vacancies for the positions of lieutenant and captain, it could only promote individuals to lieutenant because a captains examination had not yet been administered.

"According to O'Connor, the fire department's command structure was seriously lacking in supervisory positions. It was O'Connor's position that the fire department could not wait for the administration of additional civil service examinations; rather, O'Connor set out to fill vacant positions immediately.[11] Accordingly, between 1996 and 1997, the fire department promoted to lieutenant, in standard rank order, forty individuals who had passed the September, 1995 lieutenants examination. This brought the total number of lieutenants beyond that which the city budget allowed. In order to pay the excess lieutenants, the fire department used funds allocated for vacant captain and battalion chief positions. Thus, although the fire department exceeded the appropriations in the budget allocated for lieutenants, the department was within the budget for the appropriations devoted to captains and battalion chiefs; and it was within its total budgeted salary expense. The practice of using funds allocated for a

[11] "The fire department had been utilizing an authorized procedure whereby firefighters were appointed to a higher rank, and received pay for that higher rank, for particular shifts on an as-needed basis. O'Connor maintained that using inexperienced firefighters as 'acting' officers in this manner was inefficient and dangerous." *Broadnax* v. *New Haven*, supra, 270 Conn. 142 n.10.

vacant higher rank to pay individuals employed at a lower rank is known as 'underfilling.'[12]

"After serving the requisite time in grade; see footnote [8] of this opinion; the newly promoted lieutenants, including those promoted through underfilling, became eligible to sit for a captains examination, which was administered in April, 1998. Some of the underfilled lieutenants were subsequently promoted to captain on the basis of their success on the captains examination." (Citations omitted.) *Broadnax* v. *New Haven*, supra, 270 Conn. 139–43.

The following additional facts were adduced at trial and are not in dispute. On March 13, 1996, the defendants promoted to lieutenant, in the usual rank order, twenty-two firefighters, including the plaintiffs, from eligibility list No. 96-02.[13] Id., 150–51. The defendants thereafter promoted, again in rank order, eleven firefighters on July 3, 1996,[14] and seven firefighters on October 16, 1996.[15] Id., 151. For purposes of this litigation, the first twenty of those lieutenants who were promoted in March, 1996, including the plaintiffs, are

---

[12] "Before engaging in the practice of underfilling, O'Connor sought approval from the board of fire commissioners, which has the ultimate authority in personnel decisions. After inquiring with the attorney for the city, the board approved the use of underfilling." *Broadnax* v. *New Haven*, supra, 270 Conn. 143 n.11.

[13] The twenty-two firefighters promoted on March 13, 1996, in standard rank order, were John Shepa, Kevin Delaney, Ralph Black, Brantley, William Seward, Vincent Landisio, John Marquez, Anthony Calloway, Thomas Neville, Richard Rife, Robert Gilhuly, John Rourke, Paul Sandella, William Gould, James Robinson, Ronald Scarano, Patrick Andrews, James Schwartz, Texeira, Thomas Quinn, Edward Riordan and John Ryan.

[14] The eleven firefighters promoted on July 3, 1996, were Dennis Miller, Miguel Rosado, Christopher Sanchez, Ronald Dumas, Sheryl Broadnax, Thomas Heins, Michael Walker, Charles Hewitt, Thomas Dwyer, James Stacy and William Integlia.

[15] The firefighters promoted on October 16, 1996, were Anthony Annunziato, David Morgan, Ralph Santora, Howard McCann, Steven Andreucci, Julian Garay and Anthony Gallicchio.

considered to have been promoted without the benefit of underfilling.[16] The last twenty are considered to have been underfilled.[17] Id.

Thirty-nine of the newly appointed lieutenants, including the plaintiffs and nineteen of the twenty who had been underfilled,[18] passed the 1998 captains examination. Six firefighters who had attained the rank of lieutenant prior to 1996 also passed that examination.[19] Their names appeared, in rank order based on test scores, on eligibility list No. 98-35, which was certified on September 2, 1998. Id. The defendants thereafter promoted to captain, in standard rank order, thirty-four lieutenants from eligibility list No. 98-35. Id., 152. Thirty-nine lieutenants ranked higher than Texeira on eligibility list No. 98-35, and at least forty lieutenants, including Texeira, ranked higher than Brantley on that list.[20] Id. Accordingly, neither plaintiff was promoted to the rank

[16] Sixteen vacancies for lieutenant existed at the time of the first twenty-two promotions on March 13, 1996, and four additional vacancies developed between March and October, 1996. *Broadnax* v. *New Haven*, supra, 270 Conn. 151. Accordingly, four firefighters, including Texeira, who initially had been underfilled into lieutenant positions on March 13, 1996, eventually would have become eligible to take the April, 1998 captains examination without the benefit of underfilling. Id., 151, 157–58. Therefore, the first twenty firefighters who were promoted to lieutenant on March 13, 1996, including the plaintiffs, are not considered to have been underfilled. See footnote 13 of this opinion.

[17] The twenty underfilled firefighters included John Ryan and Edward Riordan, who were promoted in March, 1996, and all of the lieutenants who were promoted in July and October, 1996. See footnotes 13, 14 and 15 of this opinion.

[18] It is not clear whether Charles Hewitt, who had been promoted on July 3, 1996; see footnote 14 of this opinion; opted not to compete on the April, 1998 captains examination or failed to achieve a passing score, but his name does not appear on eligibility list No. 98-35.

[19] The firefighters who had been promoted to lieutenant prior to 1996 were John King, Thomas Holman, Michael McNamara, Kevin McNerney, Gerald Boucher and Joseph DeCato.

[20] Brantley tied another lieutenant with a score of 74. Thus, depending on his seniority, he could have been either the forty-first or forty-second lieutenant promoted. *Broadnax* v. *New Haven*, supra, 270 Conn. 152 n.23.

of captain. Both plaintiffs would have been promoted to captain if the defendants had not underfilled firefighters into the rank of lieutenant in 1996. Id., 158. In addition, three Caucasian firefighters promoted to budgeted positions as lieutenants would have been promoted to captain if not for underfilling.[21]

The plaintiffs brought this action pursuant to 42 U.S.C. §§ 1981 (a)[22] and 1983[23] challenging the defendants' use of underfilling. In their substitute complaint,[24]

[21] These lieutenants were James Schwartz, Gerald Boucher and Joseph DeCato.

[22] Section 1981 (a) of title 42 of the United States Code provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."

[23] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[24] The original plaintiffs; see footnote 3 of this opinion; initiated this litigation on April 23, 1998. The trial court subsequently granted the defendants' motion to strike the original plaintiffs' claims that the defendants had violated their rights to due process and equal protection under the United States constitution and article first, §§ 1 and 10, of the constitution of Connecticut. *Broadnax* v. *New Haven*, supra, 270 Conn. 144. After a trial, the court concluded that, because the original plaintiffs had not filed a complaint with the affirmative action commission, they had failed to exhaust their administrative remedies with respect to their claim that underfilling violates the city's affirmative action plan. Id., 145–46. The trial court, however, agreed with the original plaintiffs' claim that underfilling is illegal because it violates the city's charter and the city's civil service rules and regulations. Id., 146–47. The trial court permanently enjoined the defendants from engaging in the practice of underfilling and appointed a special master to oversee promotions within the fire department. Id., 147.

As we have indicated, in *Broadnax I*, we affirmed the judgment of the trial court striking the original plaintiffs' due process claims, enjoining the defendants from further use of the practice of underfilling and appointing a special master, but reversed the judgment of the trial court striking the

the plaintiffs allege that, as a result of underfilling, they were denied promotions to the rank of captain despite having passed the April, 1998 captains examination and further were denied the opportunity to compete in subsequent promotional examinations for the positions of battalion chief and deputy chief. Specifically, the plaintiffs alleged that underfilling "so diluted the pool of eligible candidates for promotional positions within the [fire department] that the plaintiffs' opportunity to be promoted ha[s] been unfairly and adversely affected, resulting in their respective chances for promotional advancement being unfairly, substantially and discriminatorily diminished." The plaintiffs further alleged that underfilling disproportionately favored similarly situated firefighters who were not African-American. Therefore, the plaintiffs claimed, they were denied the equal protection of laws in direct violation of the fourteenth amendment to the United States constitution. The plaintiffs' complaint seeks, inter alia, damages for lost wages, future lost wages, known as "front pay," lost pension value and noneconomic damages.

The plaintiffs tried the issues of liability, lost wages and noneconomic damages to a jury, and the parties agreed that the trial court would decide the issues of front pay and lost pension value.[25] On June 29, 2005, the jury returned verdicts for the plaintiffs and awarded damages as follows: (1) for Brantley, $43,218 in lost wages and $217,260 in noneconomic damages; and (2)

original plaintiffs' equal protection claims only as to Brantley and Texeira. Id., 174–75, 179. We noted, however, that "[i]t may well be that [Brantley and Texeira] will have difficulty proving [their equal protection claim] . . . because it is undisputed that: (1) contrary to the plaintiffs' complaint, *not all* of the new lieutenants promoted through the process of underfilling were Caucasian; and (2) the defendants promoted individuals in standard rank order." (Emphasis in original.) Id., 175 n.42.

[25] The parties agreed to bifurcate the issues related to damages following the trial court's declaration of a mistrial on April 7, 2005.

for Texeira, $71,712 in lost wages and $178,920 in non-economic damages.[26]

The defendants then filed motions to set aside the jury verdicts and for remittitur.[27] See Practice Book § 16-35.[28] The defendants contended, inter alia, that the verdicts should be set aside because the plaintiffs had failed to produce any evidence that the defendants had treated them differently than similarly situated individuals who were not African-American or that the defendants had intentionally discriminated against them or had showed deliberate indifference to their equal protection rights. The trial court rejected this argument on the ground that the plaintiffs had presented evidence that the intended beneficiaries of the practice of underfilling were six firefighters who were not African-American and had been demoted as the result of the Appellate Court's decision that the practice of stockpiling violated the city's charter and civil service rules. See *New Haven Firebird Society* v. *Board of Fire Commissioners*, supra, 32 Conn. App. 593. Although the trial court appeared to acknowledge that the percentage of African-American firefighters in the pool of lieutenants promoted through underfilling was no smaller than the percentage of African-Americans in the pool of lieutenants promoted through the ordinary promotion process, the court concluded that, under *Olmstead* v. *L. C.*, 527 U.S. 581, 599 n.10, 119 S. Ct. 2176, 144 L. Ed.

[26] The trial court did not decide the issues of front pay and lost pension value immediately after the jury returned its verdicts.

[27] The defendants argued that: (1) the jury lacked sufficient evidence to find reasonably in favor of the plaintiffs; (2) the trial court improperly had admitted evidence of the 1975 consent decree and the Appellate Court's decision in *New Haven Firebird Society* v. *Board of Fire Commissioners*, supra, 32 Conn. App. 585; and (3) counsel for the plaintiffs had made highly prejudicial and improper remarks during his closing argument, thereby compromising the defendants' right to a fair trial.

[28] After the trial court denied the defendants' motion, the defendants appealed from that ruling to the Appellate Court. The Appellate Court thereafter dismissed the defendants' appeal for lack of a final judgment.

2d 540 (1999), "[t]he fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of his [protected status]." (Internal quotation marks omitted.)

On January 2, 2007, after additional evidentiary hearings in July and August, 2006, the trial court issued its ruling on the issues of front pay and lost pension value. With respect to Texeira, the court credited the estimate of the defendants' expert, Jerome Sagnella, Jr.,[29] and awarded damages in the amount of $51,250.18 for front pay and $41,098.26 for loss of pension value. With respect to Brantley, the court noted that the fire department had terminated him from his position prior to the jury verdict, but that, if Brantley prevailed in his appeal from the fire department's decision to terminate him, which was then pending in the Appellate Court, and was restored to his position as lieutenant, the front pay and loss of pension amounts presented by the parties' experts would have to be recalculated. Accordingly, the trial court declined to award front pay or calculate loss of pension value with respect to Brantley. The trial court further expressed its "belie[f] that under [Practice Book] § 17-4,[30] it has continuing jurisdiction to entertain a motion to [open] the judgment" if Brantley's termination is reversed by the Appellate Court.

On January 19, 2007, the defendants filed a motion to set aside the decision of the trial court with respect

---

[29] Sagnella is the payroll and pension administrator for the city. His job includes preparing payrolls under the terms of union contracts and administrating the police and fire pension funds.

[30] Practice Book § 17-4 (a) provides: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent. The parties may waive the provisions of this subsection or otherwise submit to the jurisdiction of the court."

to the plaintiffs' front pay and lost pension value. The defendants argued that the award of front pay to Texeira should be set aside because he had failed to mitigate his damages. With respect to Brantley, the defendants argued that: (1) the trial court lost jurisdiction to decide the issues of front pay and lost pension value because it had failed to render judgment within the 120 day timeline set forth in General Statutes § 51-183b; and (2) Brantley failed to submit evidence of the likelihood that he would win his appeal and be reinstated.

On July 25, 2007, the trial court rejected the defendants' arguments and denied their motion to set aside the January 2, 2007 decision. In the meantime, the Appellate Court had reversed Brantley's termination. See *Brantley* v. *New Haven,* 100 Conn. App. 853, 854–55, 920 A.2d 331 (2007) (reversing judgment of trial court vacating decision by department of labor board of mediation and arbitration to reinstate Brantley's employment). Accordingly, the trial court determined that a supplemental hearing would be scheduled to address the unsettled issue of Brantley's front pay and lost pension value.

The defendants then filed two of the present appeals. The first appeal, SC 17971, challenges the January 2, 2007 judgment of the trial court with respect to Texeira,[31] and the second appeal, SC 17972, challenges the January 2, 2007 judgment of the trial court with respect to Brantley. Both appeals challenge the denial of the

---

[31] In SC 17971, the defendants also challenge the trial court's denial of their January 19, 2007 motion to set aside the January 2, 2007 judgment with respect to Texeira. In its memorandum of decision on the defendants' motion to set aside the January 2, 2007 judgment, the trial court simply stated that it had discussed in its January 2, 2007 judgment the defendants' claim that Texeira had failed to mitigate damages and that it "still is of the opinion that the defendants have not proven this claim." Accordingly, to the extent that we address the issue of mitigation of damages in SC 17971, we focus our analysis on the trial court's January 2, 2007 judgment in favor of Texeira.

defendants' motion to set aside that judgment. On December 5, 2007, this court stayed the defendants' appeals pending notice of the trial court's decision on the issue of front pay as to Brantley.

On February 19, 2008, after a final evidentiary hearing on September 20 and October 5, 2007, the trial court awarded Brantley $17,273.23 in front pay and $149,347.17 in lost pension value. The defendants thereafter amended their appeal in SC 17972 to include February 19, 2008, as the judgment date, and also filed a third separate appeal, SC 18146, challenging the February 19, 2008 judgment. After transferring the appeals to this court; see footnote 2 of this opinion; we granted the defendants' motion to consolidate the appeal in SC 18146 with the appeals in SC 17971 and SC 17972.

With this procedural history in mind, we first consider whether the defendants' appeal in SC 17972, from the January 2, 2007 decision of the trial court with respect to Brantley, should be dismissed for lack of a final judgment.[32] Although the parties did not raise this issue, we address it sua sponte because "[t]he appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear." (Internal quotation marks omitted.) *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767, 794, 967 A.2d 1 (2009). We conclude that the defendants' appeal in SC 17972 should be dismissed for lack of a final judgment.

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter

___

[32] We assume that the defendants filed the appeal in SC 17972 to protect their right to appeal if the reviewing court determined that the trial court's January 2, 2007 decision regarding Brantley was a final, appealable judgment. Similarly, we assume that they filed their appeal in SC 18146 to protect their right to appeal if the reviewing court determined that there was no final judgment with respect to Brantley until the trial court's February 19, 2008 decision.

jurisdiction is a question of law . . . ." (Internal quotation marks omitted.) Id., 793. A judgment "rendered only upon the issue of liability without an award of damages" is interlocutory in character and not a final judgment from which an appeal lies. *Stroiney* v. *Crescent Lake Tax District*, 197 Conn. 82, 84, 495 A.2d 1063 (1985); see also *Balf Co.* v. *Spera Construction Co.*, 222 Conn. 211, 212, 608 A.2d 682 (1992) (summary judgment rendered upon issue of liability only, without deciding damages, is not final judgment from which appeal lies).

In the present case, the jury returned verdicts as to the defendants' liability and awarded back pay and noneconomic damages to the plaintiffs, but did not decide the remaining issues of front pay and lost pension value. The trial court's January 2, 2007 decision further postponed a final determination of Brantley's front pay and lost pension value claims. The resolution of those claims for relief was a necessary predicate to the finality of the judgment with respect to Brantley because the claims seek compensation for the alleged wrongful conduct of the defendants, which "depend[s] upon an assessment of the underlying merits of the transaction between the parties." *Balf Co.* v. *Spera Construction Co.*, supra, 222 Conn. 215. Moreover, a resolution of the issues of front pay and lost pension value would afford this court "a better opportunity to review in its entirety the alleged wrongfulness of the defendant's conduct and the plaintiff's full damages, as well as other matters of equity bearing on the merits of the litigation." (Internal quotation marks omitted.) Id.

Accordingly, we conclude that the trial court's January 2, 2007 decision to delay the resolution of Brantley's front pay and lost pension value claims was interlocutory and postponed the finality of the judgment with respect to him. See *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 34, 930 A.2d 682 (2007) (dismissing appeal for lack of final judgment when parties entered

into agreement that effectively put certain remaining claims "on hold" pending outcome of appeal). We therefore dismiss the defendants' appeal in SC 17972 for lack of subject matter jurisdiction.[33]

Having concluded that this court lacks jurisdiction over the defendants' appeal in SC 17972, we next address the merits of the defendants' remaining appeals. In SC 17971, the defendants appeal from the January 2, 2007 judgment in favor of Texeira. In SC 18146, the defendants appeal from the February 19, 2008 judgment in favor of Brantley. In both appeals, the defendants claim that the trial court improperly denied their motion to set aside the jury verdicts. The defendants argue that the jury reasonably could not have found that they had violated the plaintiffs' equal protection rights because there was insufficient evidence that the defendants had treated the plaintiffs differently than similarly situated non-African-American firefighters because of their race. Because the plaintiffs presented *no* evidence that the practice of underfilling reduced the chances of African-American firefighters as a class to obtain a promotion to captain or increased the chances of non-African-American firefighters as a class for such a promotion, we agree with the defendants that there was insufficient evidence to support a finding that they had violated the plaintiffs' equal protection rights.

---

[33] Practice Book § 61-9 has been amended to provide that "[i]f, after an amended appeal is filed, the original appeal is dismissed for lack of jurisdiction, the amended appeal shall not be void as long as the amended appeal was filed from a judgment or order from which an original appeal could have been filed." See Connecticut Law Journal, Vol. 71, No. 10, p. 4C (September 8, 2009). This amendment is not effective until January 1, 2010. Accordingly, the plaintiffs' amended appeal did not cure the jurisdictional defect. See *Stroiney* v. *Crescent Lake Tax District*, supra, 197 Conn. 86 n.3 (this court has no power to allow amendment conferring jurisdiction, since that in itself would be exercise of jurisdiction).

"A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 369, 788 A.2d 496 (2002). "Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine . . . whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . [I]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it."[34] (Citations omitted; internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999).

"To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must [prove] (1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of . . . law." (Internal quotation marks omitted.) *Velez* v. *Levy*, 401 F.3d 75, 84 (2d Cir. 2005). The defendants do not dispute that they were acting under color of law when they implemented the practice of underfilling. They focus entirely on the question of whether they violated the plaintiffs' federal right to equal protection under the fourteenth amendment to the United States constitution.

---

[34] The plaintiffs bore the burden of proving an equal protection violation by a preponderance of the evidence. See *Cobb* v. *Pozzi*, 352 F.3d 79, 103 (2d Cir. 2003). The plaintiffs sustained their burden of proof as to the essential elements of their equal protection claims "if the evidence, considered fairly and impartially, induce[d] in the mind[s] of the [jurors] a reasonable belief that it [is] more probable than otherwise that the facts involved in that element [are] true." (Internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 535 n.8, 733 A.2d 197 (1999).

The legal principles underlying the plaintiffs' equal protection claim are well established. "The [e]qual [p]rotection [c]lause of the [f]ourteenth [a]mendment commands that no [s]tate shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). "To establish a violation of the equal protection clause of the fourteenth amendment to the United States constitution, the plaintiff must prove that the state discriminated against him based on an impermissible, invidious classification. . . . Therefore, the plaintiff must prove that the action had a discriminatory effect and that it was motivated by a discriminatory purpose. . . . Put another way, the plaintiff must establish that he, compared with others similarly situated, was selectively treated . . . and . . . that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 673, 822 A.2d 205 (2003).

In the present case, the plaintiffs have alleged that the facially neutral, evenly applied practice of underfilling has had an adverse effect on African-American firefighters and was motivated by discriminatory animus. "To establish that an even-handedly applied, facially neutral law should be [treated as if it classified on the basis of race], the challenger normally must show that (1) the law has such a disproportionate impact on one of several groups (i.e., race, national origin, alienage, gender or illegitimacy) that we may view the law as if it created such a classification on its face, and (2) a discriminatory purpose motivated the actions of the

government officials." *Orange Lake Associates, Inc.* v. *Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994); see also *United States* v. *Armstrong*, 517 U.S. 456, 465, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (ordinary equal protection standards require plaintiff to prove that government action had discriminatory effect and was motivated by discriminatory purpose). Because we find that there was insufficient evidence presented to support a finding that the practice of underfilling had a discriminatory effect and, therefore, that the plaintiffs cannot satisfy the first prong of an equal protection violation, we need not decide whether there was sufficient evidence to support the second prong of discriminatory intent. See footnote 42 of this opinion.

"[T]he analytical predicate [of an equal protection claim] is a determination of who are the persons . . . similarly situated." *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 158, 957 A.2d 407 (2008). Accordingly, before we address the substance of the plaintiffs' claims, we must identify the persons who must be compared in order to determine whether underfilling had a disproportionately adverse effect on African-American firefighters because of their race. In their complaint, the plaintiffs alleged that the practice of underfilling "so diluted the pool of eligible candidates for promotional positions . . . that the plaintiffs' opportunity to be promoted ha[s] been unfairly and adversely affected" because of their race. They further alleged that, "[c]onversely, by virtue of the practice of underfilling, Caucasian, white firefighters of [various] ranks, who either were or are similarly situated to the plaintiffs have disproportionately benefited with respect to promotions within the [d]epartment." Thus, the plaintiffs claim that the African-American firefighters who were eligible for and desired promotion, i.e., those who took the 1998 captains examination, had, as a class, reduced chances of being promoted as the result

of underfilling, while the non-African-American fire-fighters who took the examination had, as a class, increased chances of promotion. Thus, in order to determine whether underfilling treated all similarly situated persons alike; see *Cleburne* v. *Cleburne Living Center, Inc.*, supra, 473 U.S. 439; we must compare the effect of underfilling on the pool of African-American lieutenants who took the examination with its effect on the pool of non-African-American lieutenants who took the examination.

In support of their claim that the practice of underfilling decreased the chances that African-American lieutenants would be promoted to the rank of captain in favor of non-African-American lieutenants, the plaintiffs offered, in the form of testimony and a written report, the opinion of Gerald Jaynes, a professor of economics and African-American studies at Yale University, who testified as an expert in employment discrimination. Jaynes opined that underfilling had "a discriminatory effect in the sense that it diluted the [plaintiffs'] promotion . . . possibilities by increasing the pool of individuals they had to compete with." He further testified that underfilling "favored white males because white males were the greater portion of individuals who were, in fact, underfilled." Thus, Jaynes testified that, because a larger number of non-African-American firefighters than African-American firefighters were promoted to lieutenant through underfilling, underfilling had a detrimental impact on the opportunities for African-American firefighters to be promoted to captain.

The fact that a larger number of non-African-American firefighters were promoted to lieutenant through underfilling than African-American firefighters does not establish, however, that underfilling had a disproportionate impact on the chances of African-American firefighters *as a class* to obtain a promotion to captain.

Rather, a disproportionate impact on African-American firefighters as a class could be demonstrated only by establishing that, compared to the percentage of budgeted lieutenants who were African-American, a disproportionately small percentage of underfilled lieutenants were African-American. If the percentage of underfilled lieutenants who were African-American exceeded or equaled the percentage of budgeted lieutenants who were African-American, then the chances for African-American lieutenants, as a class, to obtain promotions would be greater than or equal to their chances to obtain promotions if underfilling had not been implemented, all other things being equal.[35]

Although the evidence established that the practice of underfilling benefited the class of underfilled lieutenants by increasing their chances for promotion and adversely affected the class of budgeted lieutenants by reducing their chances for promotion,[36] the plaintiffs presented *no* evidence that the *percentage* of underfilled African-American lieutenants who were eligible for promotion to captain was smaller than the percentage of budgeted African-American lieutenants. Indeed, the evidence presented by the defendants

[35] The plaintiffs have made no claim that there were factors other than underfilling that unfairly decreased the chances of African-Americans to be promoted to captain. Specifically, the plaintiffs have made no claim that the captains examination or that the promotions in rank order based on test scores were discriminatory in intent or effect.

[36] We recognize, therefore, that the practice of underfilling did not have the same effect on all similarly situated individuals. It benefited the underfilled lieutenants and adversely affected the budgeted lieutenants. In the absence of any evidence that a disproportionately large percentage of the underfilled lieutenants were not African-American, however, this disparate treatment of the two sets of individuals cannot be viewed as if it created a racial classification on its face. See *Orange Lake Associates, Inc.* v. *Kirkpatrick*, supra, 21 F.3d 1226 (to establish that facially neutral law violates equal protection clause, plaintiff must establish that it has such disproportionate impact on protected group that it may be viewed as if it classifies on basis of group membership).

unequivocally demonstrated the opposite.[37] Accordingly, even if we assume that the jury reasonably could have rejected the defendants' evidence that underfilling had *increased* the chances of African-American firefighters to be promoted, there was no evidence from which the jury reasonably could have concluded that the practice of underfilling had *reduced* the chances of African-American firefighters as a class to be promoted or that it had increased the chances of non-African-American firefighters as a class to be promoted. Thus, there was no evidence that underfilling had a disproportionate impact on African-American firefighters thereby allowing the jury to conclude that underfilling should be treated as if it had created a racial classification on its face. See *Orange Lake Associates, Inc.* v. *Kirkpatrick*, supra, 21 F.3d 1226 (to establish that facially neutral law violates equal protection clause, plaintiff must establish that it has such disproportionate impact on protected

---

[37] The defendants presented evidence that fifty-nine lieutenants applied to take the 1998 captains examination, including the twenty underfilled lieutenants. Nine, or 15.25 percent, of the fifty-nine applicants were African-American. When the underfilled lieutenants are excluded from this group, only five, or 12.82 percent, of the thirty-nine remaining lieutenants are African-American. Fifty lieutenants actually took the examination. Eight, or 16 percent, of these were African-American. When the underfilled lieutenants are excluded from this group, only four, or 13.33 percent of the thirty remaining lieutenants are African-American.

Jaynes testified and stated in his expert report that, when the 1998 captains examination was administered, only ten of the lieutenants who took the examination would not have been eligible to take it but for the practice of underfilling, and all ten of these firefighters were Caucasian. The trial court instructed the jury, however, that, for purposes of this case, the jury was required to find that twenty firefighters, namely, John Ryan, Miguel Rosado, Sheryl Broadnax, Charles Hewitt, William Integlia, Ralph Santora, Julian Garay, Edward Riordan, Christopher Sanchez, Thomas Heins, Thomas Dwyer, Anthony Annunziato, Howard McCann, Anthony Gallicchio, Dennis Miller, Ronald Dumas, Michael Walker, James Stacy, David Morgan and Steven Andreucci, were to be considered underfilled. The trial court specifically instructed the jury that it was to disregard any testimony by Jaynes to the contrary. The plaintiffs make no claim on appeal that this instruction was improper. Of the twenty underfilled lieutenants, four were African-American, namely, Dumas, Broadnax, Walker and Hewitt.

group that it may be viewed as if it classifies on basis of group membership).

We recognize that the jury reasonably could have concluded that the practice of underfilling adversely affected the *individual plaintiffs*. Indeed, the defendants concede that, if not for the practice, the plaintiffs would have been promoted.[38] We emphasize, however, that the basis of the plaintiffs' equal protection claim is that underfilling adversely affected African-American firefighters *as a class* by reducing the chances that African-American lieutenants would be promoted to captain. Proof that individual African-American firefighters were adversely affected by the practice does not establish that underfilling adversely affected similarly situated African-American firefighters as a class. As we have indicated, there is no evidence that the practice of underfilling reduced the percentage of African-American lieutenants in the pool of lieutenants who took the 1998 captains examination. Indeed, the only evidence presented on the issue demonstrated the opposite.

We further recognize that, but for the practice of underfilling, four African-American lieutenants would

[38] The evidence also showed, however, that three Caucasian budgeted lieutenants who would have been promoted if not for underfilling were not promoted. As we have indicated, the three lieutenants were James Schwartz, Gerald Boucher and Joseph DeCato. See footnote 21 of this opinion. The plaintiffs contend that Schwartz, Boucher and DeCato were not similarly situated to them because Schwartz, at some point after the administration of the 1998 captains examination, was appointed as an acting captain and Boucher and DeCato previously had taken the captains examination and failed to pass. It is undisputed, however, that, like the plaintiffs, these three budgeted lieutenants took the 1998 captains examination for the purpose of obtaining a promotion to captain and, like the plaintiffs, they would have obtained the promotions if not for underfilling. We conclude that no reasonable jury could have concluded that the distinctions relied on by the plaintiffs were salient. Accordingly, we conclude that the only reasonable conclusion that the jury could have reached was that the three Caucasian budgeted lieutenants were similarly situated to the plaintiffs and suffered the same adverse effect from underfilling.

have been promoted to captain instead of three.[39] In order to establish that this was an effect of underfilling, however, the plaintiffs would have had to establish that a practice that *increased* the percentage of African-American firefighters who were eligible to take the captains examination somehow had the effect of *decreasing* their chances for promotion.[40] It is clear, as a matter of pure logic, that no such causal relationship can exist. Rather, any disparate impact resulted from the unforeseeable fortuity that a smaller percentage of African-American lieutenants passed the captains examination. As we have indicated, the plaintiffs have made no claim that the captains examination was discriminatory. See footnote 35 of this opinion. Accordingly, the fact that, contrary to what the defendants reasonably could have foreseen, fewer African-American lieutenants were promoted to captain than would have been promoted if underfilling had not been implemented, cannot establish that underfilling itself had an adverse impact on African-American lieutenants as a class. It would be anomalous to hold that the practice of underfilling, which had the effect of actually increasing the chances for African-American firefighters as a class to be promoted to captain, violated the equal protection clause when the undisputed evidence demonstrated that the reason that fewer African-American lieutenants were promoted was the test results, which the plaintiffs do not claim were the result of discrimination. Moreover,

---

[39] Two budgeted African-American lieutenants, Anthony Calloway and Ralph Black, and one underfilled African-American lieutenant, Michael Walker, were promoted to captain as a result of the 1998 captains examination. The defendants concede that, if underfilling had not been implemented, Calloway, Black, Brantley and Texeira would have been promoted.

[40] As we have indicated, the only evidence in this case was that the percentage of African-American lieutenants in the pool of lieutenants who were eligible to take the captains examination actually increased after underfilling. Accordingly, the foreseeable effect of the practice would be to increase the percentage of African-American lieutenants who actually could be promoted to captain, not to reduce it.

there is no evidence that the defendants had any control over the test results or that they could have predicted them at the time that underfilling was implemented.

The plaintiffs claim, however, that the jury reasonably could have concluded that the defendants had discriminated against them on the basis of their race because the "individuals who the jury undoubtedly considered for purposes of determining whether disparate treatment occurred with respect to the plaintiffs were those white firefighters whose badges had been taken away" as the result of the Appellate Court's decision in *New Haven Firebird Society* v. *Board of Fire Commissioners*, supra, 32 Conn. App. 592–93.[41] The plaintiffs contend that the identification of the similarly situated individuals is a question of fact for the jury; see *Mandell* v. *Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); and that the jury reasonably could have found that the plaintiffs were similarly situated to the lieutenants who had been demoted following *New Haven Firebird Society*, but not to any of the other lieutenants who took the captains examination. Finally, they contend that the evidence supports a finding that the defendants intended to treat the firefighters who had been demoted more favorably than them. Specifically, they point to evidence of a history of litigation against the fire department challenging its minority hiring practices, evidence that the stockpiling case had resulted in racial tension in the department, evidence that the practice of underfilling had no bona fide job-related purpose and the fact that all of the demoted firefighters were Caucasian.

We are not persuaded. First, the plaintiffs never asked the jury to find that they were similarly situated *only* to the underfilled firefighters who previously had been

---

[41] These firefighters were William Seward, John Ryan, William Integlia, James Stacy, Steven Andreucci and Julian Garay. All but Seward had been promoted to lieutenant through underfilling. All but Ryan were promoted to captain as the result of the 1998 captains examination.

demoted. Rather, the plaintiffs argued to the jury that the members of the unprotected class to whom they were similarly situated were the "lieutenants [with whom] they sat . . . for the captains [examination]." The plaintiffs then argued to the jury that the evidence established that the defendants had treated the plaintiffs "differently than members of another identifiable group such as those individuals who lost their badges." Thus, the plaintiffs suggested that, if the jury found that the plaintiffs were similarly situated to one group, i.e., the lieutenants who sat for the captains examination, and if it then found that the defendants had treated them differently than a mere subset of this group, i.e., the underfilled lieutenants who previously had been demoted, this different treatment would constitute discrimination in violation of the equal protection clause.

Second, and more fundamentally, the plaintiffs have not explained to this court why their treatment reasonably may be compared *only* to the treatment of the underfilled lieutenants who previously had been demoted, and not to the treatment of the similarly situated non-African-American budgeted firefighters whose chances of promotion also were reduced as the result of underfilling. Nor do they explain why the treatment of the demoted firefighters should be compared *only* to the plaintiffs' treatment, but not to the treatment of the similarly situated African-American underfilled lieutenants whose chances of promotion also were increased as the result of underfilling. They simply make the bare assertion that the jury reasonably could have compared the favorable effect of underfilling *only* on the demoted firefighters with the adverse effect *only* on the plaintiffs in determining whether the defendants had discriminated against the plaintiffs on the basis of

their race.[42] Because the plaintiffs cannot point to any factual or legal grounds in support of their claim that the jury reasonably could have ignored the effects of underfilling on the African-American underfilled lieutenants or on the non-African-American budgeted lieutenants in making its determination as to whether the defendants had discriminated against the plaintiffs on the basis of their race, we reject this claim.[43] We con-

[42] The plaintiffs argue, and the trial court found, that the evidence supports a finding that the *intent* of the defendants in implementing underfilling was to give preferential treatment to the firefighters who previously had been demoted, all of whom were Caucasian, and that this intent was in reckless disregard of the rights of the budgeted lieutenants, including the two African-American plaintiffs. Even if we assume that the defendants had such an intent, however, the plaintiffs cannot establish that the defendants violated their equal protection rights unless they also establish that underfilling had an adverse *impact* on African-American firefighters as a class. *DiMartino* v. *Richens*, supra, 263 Conn. 673 (to establish equal protection violation plaintiff must prove both discriminatory effect and discriminatory purpose). As we have explained, to determine whether there was such an adverse impact, we must compare the effect of underfilling on all similarly situated individuals. Even if the defendants' intent was to give preferential treatment to the previously demoted firefighters, they gave the same preferential treatment to *all* firefighters who were eligible for promotion through underfilling, a proportional number of whom were African-American. Consequently, they did not treat similarly situated individuals differently because of their race.

[43] Because we conclude that the jury reasonably could not have concluded that it should limit itself to comparing the effect of underfilling on the demoted firefighters with its effect on the plaintiffs, and because the plaintiffs have not identified any other persons who were similarly situated to them but were treated differently because of their race, we need not decide whether the identification of a similarly situated class is a question of fact for the jury or a question of law for the court. We note, however, that our research has revealed no case in which an appellate tribunal has deferred to a fact finder's determination as to whether persons were similarly situated for purposes of evaluating a claim under the equal protection clause. Cf. *Chavez* v. *Illinois State Police*, 251 F.3d 612, 637 (7th Cir. 2001) (rejecting District Court's finding that plaintiff was not similarly situated to person who was treated differently); *Desris* v. *Kenosha*, 687 F.2d 1117, 1119, 1121 (7th Cir. 1982) (rejecting District Court's finding that plaintiffs were similarly situated to persons who were treated differently), cert. denied, 462 U.S. 1120, 103 S. Ct. 3090, 77 L. Ed. 2d 1350 (1983).

In their brief to this court, the plaintiffs also cite *Pyke* v. *Cuomo*, 258 F.3d 107, 108–109 (2d Cir. 2001), for the proposition that a "plaintiff alleging an equal protection claim under a theory of discriminatory application of the

clude, therefore, that the plaintiffs did not meet their burden of proving by a preponderance of the evidence that the defendants had violated their equal protection rights by implementing the practice of underfilling.

The defendants' appeal in SC 17972 is dismissed. With respect to SC 17971 and SC 18146, the judgment is reversed and the case is remanded to the trial court with direction to grant the defendants' motion to set aside the jury verdicts and to render judgment for the defendants.

In this opinion the other justices concurred.

---

law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of other similarly situated individuals." In *Pyke*, the plaintiffs, Native Americans living on a reservation, alleged that the defendants, officials of the state of New York, had failed to provide them with police protection because they were Native Americans. Id., 108. The court held that the plaintiffs were not required to show that the defendants had treated others who were similarly situated differently because of their race. Id., 108–109. The court reasoned that "[i]t would be difficult, if not impossible, to find other individuals whose situation is similar to Native Americans living on a reservation and exercising a substantial measure of self-government independent of [the] [s]tate." Id., 109. It was implicit in the plaintiffs' claim, however, that, if a group of non-Native Americans living on a reservation and exercising a measure of self-government independent from the state had existed, the defendants would have treated them more favorably because of their race. Thus, it does not follow from the court's reasoning that, if the plaintiffs *are* similarly situated to other individuals and the evidence establishes that all similarly situated individuals are treated the same regardless of their race, then the plaintiffs can establish an equal protection violation. As we have indicated, the plaintiffs' claim in the present case assumes that all of the lieutenants who were eligible to take the 1998 captains examination were similarly situated, despite their inconsistent claim that they were similarly situated *only* to the underfilled lieutenants who previously had been demoted.